FRANCIS W. WILLETT & another *vs.* GEORGE F. WILLETT.

Norfolk.   December 7, 1954. — December 7, 1955.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & WILLIAMS, JJ.

*Insanity.*

Upon an appeal from a decree of a Probate Court appointing guardians of one as an insane person under G. L. (Ter. Ed.) c. 201, § 6, as amended by St. 1941, c. 194, § 13, reported evidence did not show to be plainly wrong findings by the judge that the respondent was afflicted with a well developed mental obsession, classified medically as a psychosis of the type known as true paranoia, that he was suffering from delusions of grandiosity and persecution affecting his competency and causing him to misinterpret facts of great importance to his welfare, and that he was incapable of taking care of himself and his property; and the decree was affirmed.

PETITION, filed in the Probate Court for the county of Norfolk on October 21, 1949.

The case was heard by *Hickey, J.*

*Philip B. Buzzell,* for the respondent.

*John M. Bashaw,* (*Guy Newhall & Alvin J. Slater* with him,) for the petitioners.

RONAN, J. This is an appeal from a final decree adjudging the respondent to be an insane person, incapable of taking care of himself, and appointing his two children his guardians.

When this case was previously here, *Bashaw v. Willett,* 327 Mass. 369, on an appeal by the respondent from a decree appointing a temporary guardian and denying his motion for jury issues, it was held there was no error. The case has since been fully tried upon the merits on a petition filed by the respondent's daughter and son for the appointment of a permanent guardian. Experts in mental diseases testified on behalf of each side. The daughter also testified. The respondent occupied the witness stand for several days. Persons who resided with him at the same club and who frequently saw and talked with him testified in his behalf. We have a transcript of the evidence together with numerous exhibits and a report of the material facts found by the judge.

An appeal in equity with a report of the evidence and a report of the material facts opens up for our decision all questions of law, fact, and discretion. It is our duty to examine the evidence. We can find facts not expressly found by the judge and we can reverse the conclusion reached by him if found to be tainted by some error of law, but the findings of fact made by him are to stand unless we are satisfied that they are plainly wrong. *Trade Mutual Liability Ins. Co.* v. *Peters,* 291 Mass. 79, 83–84. *Lowell Bar Association* v. *Loeb,* 315 Mass. 176, 178. The basis of our determination of the facts which must necessarily rest upon a perusal of the printed record is not as broad as that of the judge who saw and heard the witnesses. The question for our decision is not what our opinion might be as to the sanity of the respondent — an issue of fact, with the burden of proof upon the petitioners, *Richardson* v. *Bly,* 181 Mass. 97, 99;

*Clifford* v. *Taylor,* 204 Mass. 358, 361; *Commonwealth* v. *Spencer,* 212 Mass. 438, 453; *Payne* v. *R. H. White Co.* 314 Mass. 63, 65–66 — but whether it can be said that the judge who observed and listened to all the witnesses and especially the respondent was plainly wrong in deciding that he was insane. *Berman* v. *Coakley,* 257 Mass. 159, 162. *Murphy* v. *Hanlon,* 322 Mass. 683, 685. *Allied Freightways, Inc.* v. *Cholfin,* 325 Mass. 630, 636. *Ross & Roberts, Inc.* v. *Simon,* 326 Mass. 12, 17. *Armco Drainage & Metal Products, Inc.* v. *Framingham,* 332 Mass. 129, 133.

From his life history which he narrated in considerable detail, and to which we can refer only with respect to some of the salient points in order to avoid an opinion of inordinate length, it appears that he was eighty-two years of age, alert and courteous, endowed with a fine memory, and possessed of a good power of persuasion. In his earlier years he had amassed a fortune from the wool and leather business. He organized a local bank of which he became president. He was civic minded and made gifts to the town in which he resided which the town recognized by official action. A verdict of approximately $10,500,000 in his favor was set aside by this court in 1927 upon the ground that he had executed a general release discharging the defendants. See *Willett* v. *Herrick,* 258 Mass. 585. The respondent had become interested about 1906 in acquiring large areas of land for the purpose of developing them into beautiful model villages, containing hundreds of homes of diverse types of construction, some to be constructed at a cost within the reach of ordinary workers and others at a greater cost for those who could afford to purchase them. After the decision in the *Willett* case, the activities of the respondent were mainly confined to seeking financial assistance in developing these areas. He has sold various lots of land located where they would not materially interfere with the areas he hoped to develop, retaining as best he could these areas much of which is vacant land and encumbered by mortgages and unpaid taxes. Title to some of the lots has been lost by foreclosure of mortgages, and title to others is

held by the town through tax foreclosures. The respondent has been especially interested in retaining the possession of and control over a large area known as Westover, but the affairs of the title holder of this tract are subject to pending reorganization proceedings in the Federal court. After the death of his wife he has resided at a club where he has been maintained by income from his wife's estate and contributions from his daughter, but he has never given up his ambition, after more than thirty years of unsuccessful attempts, to convert the areas into model villages.

A few years before the turn of the century, the respondent secured employment at the respondent's tannery for one Frank G. Allen who was then courting the respondent's sister-in-law and subsequently married her. When the respondent sold out his interest in this tannery in 1915, he made arrangements with the purchaser to distribute certain amounts of capital stock payable out of dividends to some of the executives including Allen, and the latter received stock worth $500,000 without paying a dollar for it. Allen became the controlling factor in the local bank which the respondent had organized. The respondent in 1911 formed a partnership with one Sears for the purpose of taking over and managing manufacturing businesses. The firm needed money for two of its subsidiaries for the purchase of raw materials the price of which had greatly increased on account of the first World War. The terms of the loan were agreed upon between the firm and the defendants named in the *Willett* case. Willett had entrusted the affairs of the firm to a committee comprising Allen and two others. It was on the advice of Allen that he executed the release that discharged the defendants in that action. The respondent frequently referred to this action of Allen as a betrayal of a trust. Allen had purchased for $3,000 three notes of Norwood Housing Association, each for $100,-000, which the respondent had indorsed. A suit brought against Allen was settled and he surrendered the notes. A fourth note similar to the other three and held by a bank was eventually discharged upon the payment of approxi-

mately its face amount. After the adverse decision in the *Willett* case, the respondent entertained bitter feelings against Allen which seemed to increase as time went on. He opposed Allen's selection as a trustee of one of our large universities. He objected to the elimination in its official publication of a part of a speech, made at the dedication of one of its buildings, containing a commendatory reference to the respondent. He accused his father-in-law and his daughter of being influenced by Allen. He warned his wife to beware of such influence. He charged Allen, who he asserted was the largest stockholder of a trust company having various branches in Norfolk County, with being responsible for the failure, for more than thirty years, of the respondent to obtain adequate funds to develop his housing projects. The respondent hired experts to determine the amount of water withdrawn by the tannery and accused Allen of withdrawing excessive amounts for the purpose of interfering with the development of the land for a housing project. When Allen replied that he knew nothing about that situation, he accused Allen of not telling the truth. He ceased to attend a church after a pew was designated for the use of Allen. Willett, during an examination by one of the alienists who subsequently testified for the petitioners, informed the alienist with a smile, as if to denote his lack of credulity, that his loss of an operator's license for a minor traffic offence was due to the influence that Allen enjoyed in the town. He attributed his reverses to Allen whose influence he described as a cord blocking his path or as a foot stuck out to trip him up. Besides, there was testimony of the daughter, one of the petitioners, that her father had a strong dislike for certain individuals whom she named and who he asserted were under the influence of Allen. She denied that Allen had exerted any influence over her. Allen was doubtless an influential person in financial and political matters in the community.

The judge acting under G. L. (Ter. Ed.) c. 201, § 6, as amended by St. 1941, c. 194, § 13, appointed two physicians, experts in mental diseases, to examine the respondent and

report to the court.  Their report was filed with the court and stated that "his [the respondent's] logic and deductions are based on premises that are controlled by obsessive and paranoid ideas.  There runs through all his thinking an obsessive grandiosity on the one hand and a sense of persecution on the other hand.  While there, is probably some basis for each of these strains of thought, it is our opinion that they have been increased to pathological dimensions, that they lead him to misinterpret facts of everyday life and do indeed impair his judgment."  Both testified in support of the opinion expressed in the report, and that the respondent was suffering from a type of mental illness classified as paranoia.  One of these experts, who at the request of the respondent examined him on six occasions subsequent to the filing of his report, substantiated his original diagnosis that he was suffering from paranoia, a slowly and insidiously developing system of delusions where there is a good preservation of the personality in many respects which do not have to do with these delusions.  In his opinion, in view of the extent of the respondent's delusions and the influence that they exerted upon his behavior and thought, the respondent was insane.  This expert, who had seen Willett several times after he had filed his report in court and had dined with him and had ridden with him over his property, testified that "knowing Mr. Willett's charm, knowing the preservation of his intellectual faculties, I felt we were up against a very serious matter in rendering a decision psychiatrically."  The other expert testified that the respondent was insane as is a person "where disturbances of the mental type are of sufficient degree to interfere with his balance and his normal judgment."  He also testified that Willett "was a sick person whose judgment was impaired by his illness.  In a sense, he might be considered insane."

Besides introducing evidence of experts tending to show that he was not insane, the respondent attacks the opinions of those called by the petitioners who expressed their opinions that he was an insane person.  One of the chief

symptoms of paranoia is the entertainment of delusions by the victim of this type of mental illness. The respondent argues that a delusion is a false belief and that, as it has not been shown that beliefs expressed by him concerning Allen were false or at least not warranted by the evidence and so would amount to no more than a mistake of fact, there is no adequate basis upon which the petitioners' experts could put their opinions that he was insane. The petitioners' answer to this contention is that it was not necessary, in order to make a proper diagnosis of the respondent's mental condition, to have an investigation made as to the truth or falsity of the respondent's beliefs, and that what these experts were interested in was to ascertain the pattern of his thinking and the manner in which he handled himself in his emotional life. There was evidence that all or almost all cases of paranoia start on the basis of a supposed wrong to the individual. It is the development of his thinking concerning that wrong and its involvement with his general life structure and behavior to such an extent that it greatly interferes with his judgment, that demonstrate the presence of this mental illness.

It is not disputed that Willett thought that Allen had done him a great wrong. Willett had lost his fortune. He had failed to accomplish one of his life's ambitions — the development of the housing projects. It was natural for him to recall his prosperous and his disastrous days. He had no difficulty in narrating them in much detail during the hours he spent as a witness. Had his disappointments and adversities become too heavy for him to bear and so weakened his judgment as to render him unable properly to conduct business transactions? Numerous residents of the same club where Willett lived, some of whom saw him frequently and some had known him for years, testified in substance that they never observed anything that indicated to them that Willett was suffering from any mental illness. There was evidence that he was afflicted with a type of illness that those with whom he associated would not suspect that he had. As to the extent his judgment

might be impaired in conducting a business transaction, there was testimony that he might become involved "with suspicions that might cause him not to do it because he thought it would be deleterious or that there was a plot back of it." Willett had sold considerable property between 1918 and 1940. There was no evidence that he did not receive a fair and reasonable price. On the other hand there was testimony of qualified experts called by the respondent that he was not afflicted with any mental illness.

The judge found that there is a persistency and repetitiveness in Willett's thinking, writings, and actions relative to a conspiracy to prevent him from obtaining the funds necessary to develop his housing projects, and that such a conspiracy does not exist. He also found that he is afflicted with a well developed mental obsession, classified medically as a psychosis of the type known as true paranoia; that he is suffering from delusions of grandiosity and persecution that affect his competency and cause him to misinterpret facts of great importance to his welfare; and that he is incapable of taking care of himself and his property.

The respondent finally contends that by the terms of the governing statute, G. L. (Ter. Ed.) c. 201, § 6, as amended, he must be found to be insane and "incapable of taking care of himself" before a guardian can be appointed. Enough has already been said as to the nature and effect of the respondent's mental illness together with the findings of the judge in connection therewith, which cannot be pronounced plainly wrong, to support the conclusion that the respondent was suffering from insane delusions. We are of opinion that there was no error in finding that he was incapable of taking care of himself.

There was no error in excluding a question put to one of the respondent's counsel who had become a witness as to whether he had noticed anything in the respondent's conversation that indicated anything singular or unusual respecting his mental condition. After an argument by counsel the judge permitted the witness to answer a sub-

stantially similar question.  *McCoy* v. *Jordan,* 184 Mass. 575.  The respondent suffered no harm.  *Posell* v. *Herscovitz,* 237 Mass. 513.

*Decree affirmed.*