Daniel F. Mulcahy vs. Alvah R. Boynton, executor.

Plymouth. May 2, 1960. — June 8, 1960.

Present: Wilkins, C.J., Spalding, Williams, Whittemore, & Cutter, JJ.

*Executor and Administrator,* Appraiser. *Probate Court,* Costs, Counsel fees.

Discussion of appraisals in decedents' estates. [175–177]

On an appeal by an executor from a decree of a Probate Court under G. L. c. 215, § 39, allowing a petition by one of three appraisers of the estate for $175 for his services, where essentially undisputed facts revealed that the estate, except for jewelry, clothing and personal effects of slight value, consisted of easily appraised securities and savings bank accounts, that no special qualifications were needed and the petitioner possessed none, that he could not reasonably have spent in the aggregate more than two or three hours in routine duties, and that he was offered $60 by the executor, which was one third of the amount the executor proposed to distribute equally among the three appraisers as fair compensation, approximately one tenth of one per cent of the total appraised value of the estate, this court approved the executor's compensation formula and reduced the petitioner's compensation to $60. [177]

Mulcahy *v.* Boynton.

In a proceeding in a Probate Court and in this court on appeal by an appraiser of an estate to obtain compensation for his services, where it appeared that his services were routine and that the compensation sought was excessive, his counsel's services and related expenses were of no benefit to the estate and counsel's charges therefor, although reasonable in amount, should not be paid out of the estate.   [178]

PETITION, filed in the Probate Court for the county of Plymouth on January 29, 1959.

The case was heard by *Stone,* J.

*Loring P. Jordan, Jr.,* for the respondent.

*George A. White,* for the petitioner.

CUTTER, J.   This is an appeal from a decree entered in the Probate Court for Plymouth County allowing $175 for the petitioner's services as appraiser in the estate of Eleanor L. Boynton and $100 for services and expenses of his counsel.   The evidence is reported.   The scope of our review is that stated in *Willett* v. *Willett,* 333 Mass. 323, 324–325.   See *Zelman* v. *Killion,* 337 Mass. 666, 669.

Alvah R. Boynton, appointed executor of the will of Eleanor L. Boynton, filed a bond without sureties on April 17, 1958.   On the back of the bond the names of three appraisers were suggested.   Two nominees were not residents of Plymouth County.   The register "struck out one of the appraisers suggested from outside of the county . . . and inserted" the name of the petitioner, a resident of Plymouth.   The record suggests (a) no reason for this of any benefit to the estate or any beneficiary, and (b) no unfitness of the proposed appraiser.   The executor's counsel, however, raised "no question of the legality of" the petitioner's appointment as appraiser and we, therefore, do not consider whether this apparently unnecessary action was either proper or appropriate.   See, however, Newhall, Settlement of Estates (4th ed.) § 77, fn. 1.

The estate was appraised for a total of $174,957.28. There was no real estate.   There was jewelry valued at $328, by one Kelley, associated with a Boston firm of diamond importers.   The probate appraisers (of whom Kelley was not one) adopted this figure.   The petitioner admitted

that he had "not personally" had experience in the valuation of jewelry. There were clothing and personal effects valued at $100. The appraisers reasonably accepted the view of the executor's counsel, Mr. Meyer, that these "were of a most minor nature" and his insertion in the inventory, with respect to them, of "the nominal value of $100." The balance of the estate consisted of easily appraised assets: savings bank accounts, United States savings bonds, Series "E," blocks of two issues of the mortgage bonds or debentures of well known utility companies, and blocks of the common stocks of nine companies, all well known. Of these, the stock of only one company is not now quoted in the daily press as listed on the New York Stock Exchange. That was the stock of a Boston trust company, for which frequently an "unlisted" quotation appears in a Boston newspaper. The inventory shows that the appraisal of this estate would present no difficulties whatsoever, except possibly the valuation of the jewelry as to which for death tax purposes the opinion of an expert gem appraiser would probably be required, if the value was substantial (or to satisfy the taxing authorities that the jewelry value was not substantial). See e.g. 26 CFR (Federal estate tax regulations, 1958) § 20.2031–6.

The trial judge found that the petitioner was "an eminently qualified appraiser." The testimony relevant to this finding showed no special qualifications beyond those of many informed citizens. The petitioner had worked for twenty-seven years in the office of the Secretary of the Commonwealth (where he was supervisor of elections in charge of ten to thirty-five people), had been probate appraiser in fifteen other estates, was a high school graduate, had taken no courses in security transactions, and had not engaged in security transactions for himself or for others. During his services in other estates he had not personally appraised securities.

The petitioner shortly after his appointment on April 18, 1958, had a telephone conversation with the executor but did not see him. He spoke casually once to one of the other

appraisers who was pointed out to him on a railroad train. He had several telephone talks with Mr. Meyer, counsel for the executor, or with people in his office, in an attempt to get a list of assets. The petitioner also wrote to Mr. Meyer's office on November 3, 1958, requesting such a list. On December 8, 1958, Mr. Meyer sent to the petitioner the original inventory form filled out and signed by the other two appraisers. The petitioner had a stenographer copy the list of securities. He handed the list to a "friend . . . in the banking department" who gave him the unit values of the items at the testatrix's death. These he rechecked with someone in the inheritance tax office. He "accepted the valuation of jewelry, clothing, savings bank accounts, supplied . . . by Mr. Meyer," and then multiplied out the unit price furnished to him for each security by the number of units of that security. With respect to the United States savings bonds, the values were looked up by the petitioner's friend "on the tables the banks have." This checking resulted in a total estate within $30 of the total reported by Mr. Meyer.

The petitioner then went to Mr. Meyer's office to be sworn as appraiser and signed the inventory. They "talked about compensation. He [Mr. Meyer] said, '. . . one tenth of one per cent would be approximately $180; divide that by three it would be . . . $60 . . . .' He said he was ready to give . . . a check for $60" which the petitioner declined. The petitioner then sent Mr. Meyer a bill for $175, which has not been paid. No meeting of the three appraisers took place and no occasion for any such meeting appears.

The probate judge found "that the responsibilities assumed by the appraiser, the time consumed and the results achieved justify his charge of $175," and also that $175 "was not excessive, but was a fair and just amount for services rendered considering all the circumstances of this case, including the time spent . . . , the size of the estate, and the many occasions when the petitioner attempted to carry out his duties." The judge also found "that the appraiser was subjected to fees and expenses and the employment of counsel."

Mulcahy *v.* Boynton.

The evidence shows that the petitioner had one direct conversation with Mr. Meyer and perhaps six or seven telephone conversations with him or his office each of which "took a couple of minutes maybe." His conversation with his "banking department" friend and his conversation with the man in the inheritance tax office took not over ten minutes apiece. He made eleven multiplications in computing from the unit value of each security the total value of the estate's holdings of that security. The petitioner, on cross-examination, was unable to state how long in the aggregate this work, or various segments of it, took. He never asked to see, nor was he offered a chance to see, any of the estate's property and there was no reason for any such examination.

The executor properly concedes that the petitioner is entitled under G. L. c. 215, § 39,[1] to a decree awarding him the fair value of his services and makes no request that the petitioner's compensation be reduced because he did not himself do the checking of the security values. The inventory (although appropriately to be filed within three months of appointment, see G. L. c. 195, §§ 5, 6; c. 205, § 1, cl. 1, First; see also G. L. c. 65, § 22) is now principally "a somewhat artificial starting point for probate accounting." See *Hutchinson* v. *King,* 339 Mass. 41, 45; Newhall, Settlement of Estates (4th ed.) §§ 274, 278, 279. As early as 1920, the Judicature Commission (1921 House Doc. No. 1205, p. 90) directed attention to the circumstance that the appraisals in the probate inventory had ceased to have determinative significance even in inheritance tax matters. See discussion in the 34th Report of the Judicial Council (1958), Pub. Doc. No. 144, pp. 52–53. See also 1958 Pub. Doc. No. 166, pars. 68, 69.

The necessity of careful listing and valuation of property for Federal estate tax purposes (see 26 CFR [1958] §§ 20.2031–1 to 20.2031–9) and the similar care required in preparing valuations for State inheritance tax purposes make it necessary for an executor and his counsel, in view

[1] Section 39 provides that "[p]robate courts may ascertain and determine the amount due any person for services as appraiser."

of tax valuation regulations, in many instances, to obtain
from experts and specialists valuations for any property
other than money and securities having a readily ascertain-
able market value.  There is every reason for avoiding
duplication of appraisal expense, an effort in which those
settling decedents' estates are entitled to the full coöpera-
tion and support of the courts.  It is a matter of common
knowledge that executors and their counsel frequently place
specialized appraisals of experts, which must be obtained
in any event for tax purposes, at the disposal of the probate
appraisers (as Mr. Meyer did with respect to the jewelry
appraisal in this case) or, very properly, seek to have the
experts or some of them appointed also as probate apprais-
ers.  Where such experts' appraisals are available, or
where the estate consists principally of United States gov-
ernment bonds, money, bank accounts, listed securities, and
securities with a good "over the counter" market, the task
of the probate appraiser is substantially clerical only.
There is every inducement for prudent counsel for an es-
tate, in order to be sure that the inventory is properly
prepared and takes proper account of tax appraisals, to do
precisely what Mr. Meyer seems to have done, viz., prepare
the valuations himself and furnish the prepared inventory
to the probate appraisers for such checking as they may see
fit to do.  In the present case, the petitioner could not rea-
sonably have spent in the aggregate more than two or three
hours in such checking and other work or conferences,
either by himself or through others.  In the absence of any
pressure from persons interested in the estate[2] for an
earlier filing of the inventory, the petitioner's efforts to ob-
tain a list of the property were unnecessary and of no bene-
fit to the estate whatsoever.  The appraisers' duty was

_____

[2] Any actual need for early filing of the inventory has been greatly dimin-
ished, especially with respect to estates, like this one, which are subject to
the Federal estate tax.  See Internal Revenue Code of 1954, § 2032, permit-
ting an optional valuation of the estate at values a year after the testator's
death.  This provision, and waiting for a Federal estate tax audit, also may
delay final determination of the inheritance taxes under G. L. c. 65, which,
as a practical matter, usually is closely related to determinations by the
Federal estate tax authorities.

merely to place values on such property as was reported to them by the executor as being in the estate. See *Argus* v. *Kokkorou,* 308 Mass. 315, 317. It is not the appraisers' duty to search out the property of the estate, see Newhall, Settlement of Estates (4th ed.) § 77, or to do more (without thereby assuming any appreciable risk) than to perform their own function expeditiously and as economically as possible, when the list of assets is furnished to them.

In the light of the routine duties and of the fact that the petitioner had, and needed, no specialized knowledge qualifying him to appraise any unusual property, we think the rule of thumb proposed by Mr. Meyer of distributing one tenth of one per cent of the total value of the estate among the three appraisers was fair compensation. We, of course, do not suggest that an expert appraiser with specialized qualifications to appraise for taxation property of an unusual character would not be entitled in an appropriate case to compensation for special work reflecting his training and expert knowledge. This is not such a case. For what was here required the $60 offered by Mr. Meyer to the petitioner (who in connection with this minor work, of course, had no office expense) was at a high hourly rate, substantially exceeding, for anything reasonably done by or for the petitioner, the rate of compensation paid to many public officers performing highly responsible duties or to masters and auditors. See analogy of *Lewis* v. *National Shawmut Bank,* 303 Mass. 187, 191. See also *Hayden* v. *Hayden,* 326 Mass. 587, 596–597; *Perry* v. *Perry,* 339 Mass. 470, 485; Rule 20 of the Probate Courts (1959). Cf. *Williams* v. *Howard,* 330 Mass. 323, 326, where there was a larger amount of tangible personal property and there may have been other circumstances (see the original record in that case) which caused actual travel or work by the single appraiser there acting. We think that here, upon the essentially undisputed facts, the probate judge was plainly wrong (see *King* v. *Grace,* 293 Mass. 244, 251; *Wilson* v. *Askinas,* 325 Mass. 136, 138; cf. *Culhane* v. *Foley,* 305 Mass. 542, 543) in concluding that the petitioner was entitled to more than the $60 which he was offered.

The services of the petitioner's counsel in this court and the Probate Court have consumed time reasonably worth $100. The services (and related expenses) were rendered, however, in seeking to obtain an appraiser's fee in excess of what was reasonable for the petitioner's routine services. The services of counsel thus afforded no benefit to the estate and we see no justification for payment for them out of the estate. Even if, under G. L. c. 215, § 39A (as amended through St. 1951, c. 80), § 39B (inserted by St. 1951, c. 312), or § 45, counsel fees could have been awarded, in the circumstances it was an abuse of discretion to award them. See discussion in *Lewis* v. *National Shawmut Bank,* 303 Mass. 187, 191, of the importance of avoiding excessive payments from funds administered by courts of equity and probate. See also *Boynton* v. *Tarbell,* 272 Mass. 142, 146; *Berkshire Trust Co.* v. *Booth,* 317 Mass. 331, 336; *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 318 Mass. 238, 241–246; *Miller* v. *Stern,* 326 Mass. 296, 304; *Perry* v. *Perry,* 339 Mass. 470, 484–485, Newhall, Settlement of Estates (4th ed.) §§ 32, 33. Cf. *New England Trust Co.* v. *Triggs,* 339 Mass. 453, 456.

The decree is reversed. A new decree is to be entered awarding the petitioner $60 for his services as probate appraiser. No costs or counsel fees are to be awarded in the Probate Court or with respect to this appeal.

*So ordered.*