JONATHAN R. SNELLING & another, administrators, *vs.* STATE STREET BANK AND TRUST COMPANY & others.

Suffolk.   October 27, 1970. — December 15, 1970.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, REARDON, & QUIRICO, JJ.

*Exoneration.   Guaranty.   Surety.*

In a suit in equity for declaratory relief by the administrators of the estate of a guarantor of a loan to a business corporation against coguarantors and the lender, it was not a condition precedent to partial equitable exoneration of the estate and contribution from the coguarantors that the plaintiffs establish special hardship and risks to the estate if it should be forced to pay the entire debt. [400–401]

Uniform guaranties of repayment of a loan to be made to a business corporation, signed by three of its officers and directors as individuals, only one of whom secured his guaranty with a pledge of collateral, and two agreements between the three guarantors made in contemplation of the guaranties, together with evidence at the trial of a suit in equity by the administrators of the estate of the guarantor who had pledged collateral against the coguarantors, warranted conclusions that each guarantor had been actively involved in the corporation's affairs and had an equal interest in its obtaining the loan, and that the guarantors

---

[8] Excluding days spent selecting a jury.

were equally liable on their guaranties; there was no merit in contentions that the deceased guarantor had been the principal guarantor, that his coguarantors had been merely subsureties, and that, before his coguarantors could be held liable on their respective guaranties, as against the decedent's estate, collateral pledged by the corporation as security for the loan and the collateral pledged by the decedent must be applied in satisfaction of the corporate debt. [401–404]

Under uniform guaranties of repayment of a loan to a business corporation by three guarantors providing for "payment when due . . . of the principal of and interest on" the corporation's note and that each guarantor should be "jointly and severally liable," and containing comprehensive waivers of possible defences and broad consents to modification of the corporation's liabilities and changes in the incidents of its debt to the lender, upon default by the corporation the lender was entitled to recover the full amount due from any one or more of two living guarantors and the estate of a deceased third guarantor, and any of the three thereby paying more than one third of the amount due would be entitled to exoneration for the excess; there was no merit in contentions by the two living coguarantors that certain dealings between the lender, on the one hand, and the corporation and the third guarantor, an officer thereof, or the administrators of his estate, on the other hand, without obtaining the prior consent of the coguarantors, discharged them from liability to the lender and precluded the estate of the deceased guarantor from obtaining partial exoneration from the coguarantors. [404–406]

PETITION IN EQUITY filed in the Probate Court for the county of Suffolk on November 2, 1965.

The case was heard by *Mahoney*, J.

The case was submitted on briefs.

*William D. Ruckelshaus*, Assistant Attorney General, *Herbert F. Travers, Jr.*, United States Attorney, *Mary M. Brennan*, Assistant United States Attorney, and *Morton Hollander & J. F. Bishop*, Attorneys, Department of Justice, for the United States.

*John J. Sullivan* for William Herbits & another.

*Norman Burwen & Joseph F. Hodapp* for Jonathan R. Snelling & another, administrators.

CUTLER, J. The administrators with the will annexed of the estate of Henry B. W. Snelling (Snelling) by equity petition in the Probate Court have sought declaratory and other relief against (1) Mr. Axel B. Gravem and Mr. William Herbits (the coguarantors), who with Snelling guaranteed payment of a loan by Small Business Administration (SBA)

to Plymouth Bay Packing Company, Inc. (Plymouth), a Massachusetts corporation; and (2) the administrator of SBA.[1] The petition alleged, among other things, (a) that in 1956 Snelling was treasurer and Mr. Gravem president of Plymouth; (b) that Plymouth gave its note for $200,000 to SBA, secured by a mortgage of its properties and a pledge of its inventory; (c) that Snelling gave a guaranty of the note secured by a pledge of his equity in securities held by the two banks as collateral; and (d) that the coguarantors each also guaranteed the loan by an instrument (in fact unsecured), in a form quoted in part in the margin;[2] (d) that, after Snelling's death, Plymouth was adjudicated

---

[1] Two Boston banks, pledgees of collateral formerly owned by Snelling and certain individuals apparently having interests in his estate are also named as defendants. Except possibly to collect certain funds held by the banks under stipulation, no present relief is sought against them. Only declaratory relief appears to be sought against the individuals interested in Snelling's estate.

[2] The form of guaranty, signed by Snelling and each of the coguarantors to induce SBA to make the loan to Plymouth, reads in part (emphasis supplied): ". . . the undersigned hereby unconditionally guarantees to SBA . . . payment when due . . . of the principal of and interest on and all other sums payable . . . with respect to the [Plymouth] note . . . to SBA, dated November 7, 1956, in the principal amount of $200,000.00, with interest . . . . Such note . . . and all other sums payable with respect thereto are . . . collectively called 'Liabilities.' As security for . . . this guaranty the undersigned hereby . . . pledges, . . . to SBA certain collateral (if any), listed . . . on the reverse side hereof. [This provision applied only to Snelling, since Messrs. Herbits and Gravem are not shown to have furnished any collateral to SBA, whereas Snelling, on the same day on which he signed the guaranty executed two pledge agreements to SBA dealing with his equity in securities held by the two banks, respectively.] The term 'collateral' as used herein shall mean any funds . . . or other property or . . . interests . . . which may have been, are, or hereafter may be . . . pledged . . . by or on behalf of . . . [Plymouth,] or any other party to SBA . . . for the performance of this guaranty or the payment of the Liabilities . . . .

"The undersigned . . . waives any and all presentment, demand, protest or notice of dishonor, nonpayment, or other default with respect to any of the Liabilities and any obligation of any party at any time comprised in the collateral. The undersigned hereby grants to SBA full power, *in its uncontrolled discretion and without notice to the undersigned* . . . to deal in any manner with the Liabilities and the collateral, including . . . the following powers:

"(a) To modify . . . any terms of all or any part of the Liabilities or the rate of interest thereon (but not to increase the principal amount . . .), to grant any extension . . . and any other indulgence . . . and to effect any release . . . or settlement with respect thereto; (b) To enter into any agreement of forbearance with respect to . . . the Liabilities, or with respect to . . . any part of the collateral, and to change the terms of any such agreement; (c) To forbear from calling for additional collateral . . . (d) To consent to the . . . release of all or any part of the collateral, whether or not the collateral, if any, received by SBA upon any such . . . release shall be of the

bankrupt; (e) that in 1964, after an auction sale of Plymouth's assets, there remained a deficiency on the note to SBA; (f) that, while the note was outstanding, various changes were made in the loan agreement between SBA and Plymouth; and (g) that SBA had demanded of each guarantor payment of the total deficiency of $37,434.85 and interest. The court is asked to declare the amount owed by Snelling's estate and the amount of contribution due from each coguarantor. By amendment, the petitioners ask declaratory relief concerning their right to exoneration from each coguarantor, by requiring that he pay to SBA his respective share of the debt.

A decree was entered (1) that $43,848.55 was then due to SBA, of which the Snelling estate, Mr. Gravem, and Mr. Herbits were each to pay one-third, and (2) that the Snelling estate's share was to be paid from the equity in the collateral held by the banks. SBA and the coguarantors each appealed. A report of material facts sets out some facts alleged in the petition. The parties have stipulated that the collateral held by the banks (fn. 1) has been liquidated and that cash in excess of $50,000, pending the decision of this appeal, shall be held by the banks. Their claims against Snelling's estate apparently have been satisfied. The evidence is reported.

1. The coguarantors first contend that Snelling's administrators cannot obtain from the coguarantors equitable exoneration from part of the liability to SBA. They argue that, as a condition precedent to exoneration, Snelling's

same . . . value . . . [as] the collateral surrendered . . . . The obligations of the undersigned . . . shall not be released . . . or in any way affected . . . by . . . any action SBA may take or omit to take . . . .

"In case . . . [Plymouth] shall fail to pay . . . any part of the Liabilities . . . the undersigned . . . upon the written demand of SBA, will pay to SBA the amount due and unpaid . . . as if such amount constituted the . . . primary obligation of the undersigned. SBA shall not be required, prior to any such demand on, or payment by, the undersigned, to make any demand upon or . . . exhaust any of its rights or remedies against . . . [Plymouth] or others with respect to the . . . Liabilities, or . . . any part of the collateral. . . .

"The term 'undersigned' as used in this agreement shall mean the signer or signers of this agreement, and such signers . . . shall be jointly and severally liable hereunder. . . ."

estate must establish that it will be subjected to special hardship and risks if forced to pay the debt to SBA before asking contribution from the coguarantors. Nothing in *Nissenberg* v. *Felleman,* 339 Mass. 717, requires proof of special hardship or risks as a basis for exoneration. All appropriate parties are before the court. The flexible remedy of declaratory relief can adjust the conflicting interests in a single proceeding. The authorities cited in the *Nissenberg* case, 339 Mass. 717, 719–726, show the advantages of employing equitable exoneration in a complicated suretyship controversy to avoid not only a multiplicity of suits, but also expense and inconvenience to parties. See Restatement: Security, §§ 112, 156.

2. The coguarantors contend (a) that they, with respect to Snelling, were subsureties and essentially accommodation parties, and (b) that the entire corporate collateral and Snelling's collateral securing his guaranty must be applied in satisfaction of Plymouth's indebtedness before either coguarantor (as against Snelling's estate) can be held individually on his guaranty. The probate judge made no specific finding on these issues. He did find, however, that the coguarantors "guaranteed the . . . loan and . . . Snelling pledged his equity in certain . . . securities" and concluded that the coguarantors must each pay to SBA one-third of the loan balance. This finding and conclusion are inconsistent with any view that the coguarantors were subsureties. Relevant evidence, which fully supports that conclusion, is summarized below.

Mr. Herbits and Mr. Max Allen, his son-in-law, each of whom was an attorney, incorporated Plymouth in 1954 for two of the former's clients, George A. Colley, Jr., and Frank R. LoVerde. Plymouth was to freeze trash fish for mink food. Mr. Herbits negotiated the purchase of a freezer and, as trustee, took title to it and certain other property. Title later was transferred to Plymouth. Plymouth's authorized stock was 100 shares. Ninety-eight shares were issued to Mr. Herbits, although he testified that he held these shares for others. The connection, until at least well into 1957,

of Mr. Herbits (almost continuously from 1954), Mr. Allen, and Mr. Gravem (from July 16, 1956) with Plymouth as officers and directors, is set out in the margin [3] in detail.

Mr. Herbits put money into Plymouth as did Colley and LoVerde and one Marshall. He admitted (a) that in August, 1956, he "had a financial interest in Plymouth . . . at least to the extent of a loan"; (b) that he "helped" in the "financial affairs of" Plymouth in 1955 and 1956; (c) that although he "did not manage the fish business," he "managed the financing end" until "Snelling came in" and on March 20, 1956, "was still active in managing . . . [Plymouth's] financial affairs"; (d) that he was interested in seeing that Plymouth obtained the SBA loan; and (e) that he made two agreements (August 10, 1956, and September 5, 1956) with Snelling and Mr. Gravem. These contained provisions (among other matters) concerning the extent and repayment of their respective capital contributions to Plymouth,[4] their shares in Plymouth, the salaries to be

---

[3] Mr. Allen and Mr. Herbits were incorporators and directors from the outset. Mr. Herbits became president and treasurer and remained president and a director until July 16, 1956, when Mr. Gravem, also an attorney, succeeded him. Mr. Herbits was succeeded as treasurer by Snelling on June 6, 1956. Snelling had become a director and assistant treasurer on March 20, 1956. Mr. Herbits again became a director on September 5, 1956, and remained so until at least July 9, 1957. Mr. Gravem was reëlected president and director of Plymouth at the annual meetings on March 14, 1957, although he testified that he had resigned on March 9, 1957. Mr. Allen was clerk from the formation of Plymouth until at least July 9, 1957.

[4] The August 10 agreement stated the capital contributions of Mr. Herbits as $13,000, and those of Snelling and Mr. Gravem, as $7,500 each. In addition, Mr. Herbits and Snelling were each said to have contributed $2,000 to organization expense. Messrs. Gravem and Allen each contributed $500. The September 5 agreement provided that Snelling was to have a total of fifty-five shares in Plymouth. For this purpose Colley and LoVerde were to contribute six shares each and Mr. Herbits three shares. Mr. Gravem was to receive a cash fee of $2,500, if approved by SBA, and was to have ("without further cost to him") five per cent of Plymouth's stock in the event of a public offering. Snelling was to receive an annual salary of $6,000, and Messrs. Herbits and Gravem each became entitled to receive $3,600 "per annum commencing as soon as the money from the [SBA] loan is received." The provisions were stated to be made in consideration (par. 4) of Snelling pledging security on demand "of the Government" (SBA) and indorsing the loan note, and Messrs. Herbits and Gravem each indorsing the note on similar demand and all three of them (and Allen) "performing the services required of them in connection with . . . [Plymouth's] business." Plymouth was to indemnify the signers of the agreement "in the event they are called upon to meet any part of the obligation incurred due to the pledging of securities and endorsements. All parties agree to act . . . to expedite this [a]greement and . . . the approval of the [SBA] loan."

paid to Snelling and Messrs. Herbits, Gravem, and Allen from the loan proceeds, and other matters. Snelling, after March, 1956, took an increasing, if not controlling, part in Plymouth's affairs, but Messrs. Herbits and Gravem, as directors of Plymouth, participated in meetings and other activities directed toward obtaining the SBA loan. It was contemplated that Mr. Herbits "was to be employed as general counsel" of Plymouth after the loan was made.

At the time of the SBA loan application, it was represented to SBA that Mr. Gravem, Mr. Allen, and Snelling each owned twenty per cent of Plymouth's stock (although Mr. Gravem denied that he owned shares) and that Colley and LoVerde each owned fifteen per cent of the stock. Mr. Gravem in "the prosecution of the work to secure the SBA loan . . . made a trip to Washington . . . four trips to Boston . . . one to Centerville." He "spent approximately three months on the work, for which" he was paid a $2,500 fee, approved by SBA. He signed the note as president of Plymouth.[5]

Mr. Gravem testified (1) that during discussions of the SBA loan application, Snelling told him that SBA required "that the principal officers of . . . [Plymouth] be guarantors," (2) that he would guarantee the loan if Snelling put up securities as additional collateral, and (3) that Snelling asked him to do this "as a favor" and told him that he would "not be called on to pay anything on this loan." Mr. Herbits similarly testified that, toward the end of the summer of 1956, Snelling told him of SBA's request that someone "in addition to himself sign the guaranty"; that he (Mr. Herbits) refused; and Snelling said, "You would never have to pay . . . I am putting up [$150,000] personal collateral."

The credibility of this testimony about conversations with Snelling (who had died before the trial) was for the

---

[5] In August, 1957, Mr. Gravem wrote to Plymouth "looking for indemnification [on the guaranty] from . . . Snelling and those furnishing new capital." This seems inconsistent with his contention that Snelling had already agreed to indemnify him and that he was a subsurety.

probate judge to determine. We also may appraise this testimony to the extent that, on the reported evidence, we supplement the probate judge's findings. See *Willett* v. *Willett,* 333 Mass. 323, 324; *O'Brien* v. *Wellesley College,* 346 Mass. 162, 170; *Selig* v. *Wexler,* 355 Mass. 671, 672. The probate judge was not required to believe the evidence about these conversations. Indeed, that testimony, even if accepted, need not be viewed as inconsistent with the probate judge's conclusion that the coguarantors each had the same liability as did Snelling on their respective guaranties. The conversations can reasonably be regarded as little more than an optimistic prediction by Snelling that Plymouth's assets and prospects were sufficient to protect the coguarantors.

In any event, in our opinion, the conversations do not constitute an agreement that Snelling was to be principal guarantor and surety, and that, as between him and them, the coguarantors were to be merely subsureties. The agreements of August 10, and September 5, 1956 (fn. 4, *supra*), read with and in relation to uniform instruments of guaranty (fn. 2), give no support to the coguarantors' contention that they were merely subsureties. On the contrary, these instruments and the testimony already summarized show (1) that Snelling and the coguarantors were actively involved in Plymouth's affairs, and (2) that each had an equal interest in securing the SBA loan to protect his substantial investment and to assist Plymouth's progress. The probate judge's conclusions were fully justified.[6]

3. SBA's principal contention is that, "irrespective of

---

[6] The parol evidence rule may present a further obstacle to the coguarantors. We assume (without deciding) that the instruments of guaranty, by themselves, would not preclude the guarantors (as among themselves but not against SBA) from showing an agreement by them that one guarantor was to be principal surety and the other two subsureties. See Restatement: Security, § 146, comment a. See also *Taylor* v. *Savage,* 12 Mass. 98, 102; *Blake* v. *Cole,* 22 Pick. 97, 98, 101. The agreements of August 10, and September 5 (fn. 4), however, very completely express the rights of the guarantors among themselves and establish that each guarantor had (1) a significant investment in Plymouth; (2) a common interest in obtaining the SBA loan; and (3) an equal obligation to be a guarantor, without any suggestion that any one of them was to be a subsurety.

the [claim of the Snelling] estate . . . to contribution or exoneration . . . [from] the two other guarantors," SBA is entitled (as between it and each of the three guarantors) to a decree allowing SBA full "recovery against any one of the guarantors and against securities pledged by that guarantor." The contention is supported by (a) the unconditional guaranty (fn. 2) to SBA of "payment when due . . . of the principal of and interest on . . . [Plymouth's $200,000] note," and (b) the provision that the signers of the guaranty are to be "jointly and severally liable."

Each separate guaranty on the same SBA form 148 (fn. 2) contains comprehensive waivers of possible defences and broad consents to (a) modification of Plymouth's liabilities and (b) changes in the incidents of the debt to SBA. Nevertheless, the coguarantors contend that certain dealings between SBA, on the one hand, and Plymouth and Snelling, on the other hand, without obtaining new consent from either coguarantor, operated (1) to discharge the coguarantors from liability to SBA, and (2) to preclude the Snelling estate from seeking exoneration from the coguarantors.

(a) SBA and Snelling, acting for Plymouth, in 1960 agreed to release certain security furnished by Plymouth in the form of warehouse receipts for inventories of fish. SBA, in its loan authorization, had required this security. The SBA regional director was authorized to release these receipts "provided cash collateral . . . equal to the value of" the released inventories "is deposited" with the regional director. When the inventories were released no substitute collateral was provided for SBA.

(b) SBA in 1958 authorized (1) interest on certain of Plymouth's "standby" debts to be paid by Plymouth; and (2) Snelling's salary to be increased.

(c) After Plymouth's bankruptcy, SBA, at the request of Snelling's administrators, permitted delay in the liquidation of Plymouth's properties, to permit an effort to negotiate a favorable sale of assets.

Although neither coguarantor gave contemporaneous consent to any of these actions, such consent was unnecessary.

The provisions concerning security and collateral were obviously inserted in the SBA loan authorization for the protection of SBA and not for the benefit of the guarantors. Each guarantor in his guaranty (fn. 2) consented to action by SBA of each type discussed above. We have already stated (part 2 of this opinion) that the 1956 agreements among the three guarantors (fn. 4, *supra*), made in contemplation of the guaranties, must be read with them. By the 1956 agreements and the guaranties each coguarantor in effect consented to later agreements between SBA and the corporate officers of Plymouth modifying the terms of the loan and the security and granting to Plymouth various types of forbearance, without any necessity of obtaining new consent of either coguarantor. We hold (1) that SBA, by its dealings with Snelling, as president of Plymouth; with his estate in an effort to work out a favorable liquidation for all concerned; and with Plymouth did not release either coguarantor and (2) that these dealings (agreed to by SBA representatives as a matter of their "wisdom and judgment" and because they were "mutually prudent") do not preclude Snelling's estate from seeking exoneration from the coguarantors.

Although, as among the guarantors, each may enforce contribution or exoneration against the others, SBA is entitled, under the terms of each guaranty (fn. 2), to collect the whole balance of its debt from any one guarantor. The decree of the Probate Court must be modified to reflect appropriately this right of SBA.

4. The decree of the Probate Court is to be modified by striking out the paragraph numbered 2 and by substituting a paragraph providing in effect (references to a guarantor to mean him or his estate), (1) that, if within forty-five days after the date of the rescript from this court, SBA has not been paid the full amount owed to it under the paragraph numbered 1 (of that decree) then (a) SBA may collect any balance of the amount so owed to it from any one or more of the guarantors; and (b) any guarantor paying as a result an amount in excess of his one-third share of the balance of the debt to SBA may obtain reimbursement of such excess

or part thereof from any other guarantor who should have paid such excess or part thereof; and (2) that the collateral security furnished by Snelling shall continue to be held by the two banks in possession of such collateral until the debt owed to SBA (and any amount owed by Snelling's estate to the banks, respectively) shall have been paid in full, and thereafter any balance of the collateral shall be released to Snelling's estate. As so modified the decree is affirmed. The administrators of Snelling and SBA are to have costs of appeal to be paid in equal shares by the coguarantors.

*So ordered.*