Henry FRIEDMAN, Trustee of Plymouth
Bay Packing Co., Inc.,
Bankrupt

v.

Jonathan R. SNELLING et al.

Civ. A. No. 72-2279-C.

United States District Court,
D. Massachusetts.

Feb. 18, 1975.

Morris M. Goldings, Mahoney, Atwood & Goldings, Boston, Mass., for plaintiff.

George C. Caner, Jr., Ropes & Gray, Boston, Mass. (Jonathan Snelling and Norman Burwen), William F. Looney, Jr., Moulton, Looney & Mazzone, Boston, Mass., for defendants.

### MEMORANDUM and ORDER

CAFFREY, Chief Judge.

This is a civil action in which jurisdiction of this Court is invoked on the basis of 28 U.S.C.A. § 1334 and on the basis of the Federal Bankruptcy Act. Plaintiff is a Boston attorney whose practice is largely concerned with bankruptcy matters. Defendants are Edward I. Perkins, a Boston attorney; Jonathan R. Snelling, Administrator of the Estate of Henry B. W. Snelling; and Norman Burwen, a Boston attorney. The litigation, which seeks to cover a span of years going back to at least 1964, and

which indeed involved the presentation of evidence going back to at least 1956, arises out of the affairs of a Massachusetts corporation, Plymouth Bay Packing Company (hereinafter PB), and out of the affairs of Consolidated Traps, Inc. (hereinafter Traps), a wholly owned subsidiary of PB which was incorporated in 1958 as a Massachusetts corporation.

Defendant Jonathan R. Snelling is the only party on either side of this litigative fence who is not a lawyer. He is an investment counsellor and in 1964 was president and a member of the board of directors of Traps, as well as president and a member of the board of directors of PB. At that time he was also co-administrator, with the will annexed, of the estate of his late father Henry B. W. Snelling.

Defendant Norman Burwen was co-administrator, with the will annexed, of the estate of Henry B. W. Snelling.

PB was incorporated as a Massachusetts corporation in 1954, and by 1964 there were 3760 shares of its common stock outstanding, 1900 of which were owned by the estate of Henry B. W. Snelling. Over a period of years prior to his death, Henry B. W. Snelling contributed money to Traps which was used to buy boats and other equipment used in its business, which was primarily that of catching fish through the use of traps located in the waters of Cape Cod Bay.

In 1956, PB obtained a loan from the Small Business Administration (SBA) in the amount of $200,000. This loan was secured by a mortgage on the real estate and equipment of PB, which consisted of land with buildings thereon in both Provincetown and Truro, Massachusetts. In addition, the loan was further secured by a guarantee given by Henry B. W. Snelling, Attorney William Herbits and Axel B. Gravem. In 1956 Snelling was treasurer and Gravem was president of PB. Henry Snelling's guarantee of the note given by PB to the SBA was secured by a pledge of his equity in securities held by two banks as collateral. Each of the guarantors executed a written instrument.

In April 1961, Henry B. W. Snelling died, and his son Jonathan R. Snelling and Norman Burwen were duly appointed Administrators with will annexed. In February 1963, Burwen became a vice-president of PB.

Burwen testified that he became a co-administrator of the estate of Henry B. W. Snelling in December 1962 because of his contact with the estate as counsel for a life tenant under the will. As co-administrator he became aware that the estate owned approximately 51% of the property of PB. He testified that he did not take an active part in the management of PB although he was elected to the board of directors of the company in February 1963 and continued to serve in that capacity through the year 1964. He testified that he received the title of vice-president of PB in May of 1964, primarily "to lend credibility" to letters he was then writing to various potential buyers of the assets of PB which, by that time, was in serious financial trouble. I find that, as he testified, Burwen's principal responsibility to PB during the year 1964 was to find a buyer for the properties of PB. He testified that in the spring of 1964 he was aware of the fact that PB was in default on the SBA loan, that he knew it was a guaranteed loan and that the testator of the estate in which he was a co-administrator was one of the three co-guarantors of the loan.

At some time in 1964 Burwen was also designated a vice-president of Traps, for the purpose of attempting to sell off its assets, and in that capacity he wrote a letter to all creditors of Traps advising them that Traps had discontinued business as of February 6, 1964 and had leased its premises to Frank R. LoVerde. He further advised the creditors of Traps that LoVerde would thenceforth continue to do business for his own account at Traps' location. LoVerde had previously served as a manager of both PB and Traps.

A special meeting of the stockholders of PB was held on May 18, 1964 at which time the board of directors was authorized to sell the Provincetown plant of PB and equipment therein. Subsequently, advertisements seeking to sell the property were placed in the Wall St. Journal, the New York Times, and various trade journals. Although a number of responses were received, primarily through the advertisement in the Wall St. Journal, the property was not sold as a result of this advertising effort. At about this time an appraisal was made of the real estate of PB and a value of $511,000 was assigned to the Provincetown property and $291,000 was assigned to the Truro property. The same appraiser, Vilter, expressed the opinion that an "under the hammer", i. e., a forced sale, would produce $119,590 for the Provincetown property and $66,225 for the Truro property. In September 1964 the board of directors of PB recommended that PB file a petition in bankruptcy and on September 25 at a special meeting of the stockholders it was voted:

> "To direct the President, Jonathan R. Snelling, forthwith to file a voluntary petition in bankruptcy in behalf of Plymouth Bay Packing Company, Inc., to include if considered in the best interests of the Company its wholly owned subsidiary, Consolidated Traps, Inc., in the United States District Court for the District of Massachusetts, and to authorize the President to prepare and sign in behalf of the Company such petition and any and all documents and papers incident thereto."

In the period which intervened between February 6, 1964 and the September 1964 decision to file for bankruptcy of PB, its wholly owned subsidiary Traps had ceased operation but its property was kept in use by LoVerde acting for his own account on the basis of a one-year lease. Traps' principal assets were the real estate and equipment consisting of nets and poles.

In September 1964, at a meeting of the shareholders of Traps, they voted to make an assignment of all property of Traps for the benefit of creditors. This assignment for the benefit of creditors was executed on October 16, 1964 to defendants Jonathan R. Snelling and Norman Burwen as co-assignees for the benefit of Traps' creditors. Although, concededly, there is no statute which directly requires the recording of an assignment for the benefit of creditors, it was recorded at the Barnstable County Registry of Deeds on March 15, 1965 as one of the steps taken to carry out and complete a sale of Traps' real estate.

A petition for involuntary bankruptcy on behalf of PB was prepared by Attorney Burwen and filed on November 9, 1964. Attorney James Quirk of Yarmouth, Massachusetts was appointed Receiver of PB and later was appointed as Trustee in bankruptcy of PB. Attorney Edward I. Perkins was appointed counsel for Mr. Quirk on November 20, 1964. On November 23 he was named co-assignee for the benefit of creditors of Traps.

One of the bases for plaintiff's discontent is the decision made by the directors and shareholders of Traps to liquidate the assets of that company by use of the assignment for the benefit of creditors rather than by the filing of a petition in bankruptcy. Implicit in the plaintiff's complaint and explicit in the plaintiff's argument is the assumption that a bankruptcy of Traps should and would have been processed as part and parcel of the bankruptcy proceedings involving PB. I find that plaintiff has failed to establish that this should and would have been done. The evidence adduced at the trial established that Traps and PB were, in fact, separate corporations conducting two different types of business. Traps was engaged primarily in the fishing business. The object of the business was to catch and then sell a substantial number of trash fish suitable for use as feed for minks. PB was in the business of buying, freezing and

selling trash fish to mink ranches. I find that the two businesses were conducted in separate buildings and by separate employees and that each had separate and distinct trade creditors. I also find that there were common offices for the officers and the board of directors, and that the three members of the board of directors of Traps were among the seven members of the board of directors of PB. I specifically find that neither corporation was a sham or shell or *alter ego* of the other.

Plaintiff suggested that the money raised by the sale at public auction of the two buildings owned by PB was inadequate and not reflective of their fair value. He argues that had the sale been conducted at a different time and place, a larger amount of money would have been realized. I find no credible evidence supports this contention.

I find that the defendants did not select the time or place of the public auction, but that arrangements therefor followed a hand-written draft of a newspaper advertisement prepared by Mr. O'Shea of the SBA. Mr. O'Shea's hand-written draft and the newspaper advertisement which the auctioneer caused to be placed in the Boston Sunday Globe and the Boston Sunday Herald were introduced in evidence. I further find that the auction was held as a public auction on the premises of one of the two buildings which were sold, and that said building was located on one of the principal streets in Provincetown, Massachusetts. The high bidder was Frank LoVerde.

I find that the auction sale was conducted in the normal course of bankruptcy, in a public way, that it was attended by several bidders, and that the price which was obtained for the buildings, whether satisfactory to the plaintiff or not, was the best price that an experienced auctioneer could get for these buildings. Specifically, I rule that plaintiff has failed to prove any fraud on the part of the defendants concerning the sale of the two buildings owned by PB.

It appears from the record and I find that subsequent to the purchase of these buildings by Mr. LoVerde, negotiations took place as a result of which LoVerde formed a trust. He sold one quarter interest in the trust to three individuals at a price of $10,000 for each one-quarter share. One of the three individuals who purchased a one-quarter interest was Jonathan Snelling who subsequently accepted an offer from LoVerde to buy back Snelling's interest in the trust which Snelling disposed of for $7,125, sustaining thereby a $2,875 loss. I find that there was no agreement or understanding between Snelling and LoVerde prior to LoVerde's purchase of the property at the auction. I further find that LoVerde attended the auction without having made any prior commitment to anyone else that he would participate in the bidding. And I find that Snelling's investment in the trust created by LoVerde did not violate any obligation owed by Snelling to plaintiff.

Plaintiff sought to place great emphasis during the trial on the fact that Snelling served as an officer and director of PB at the same time that he served as co-administrator of the estate of his late father. Having in mind that the estate owned 50% of the stock of PB, I find that the plaintiff has failed to show any conflict of interest created by Jonathan Snelling serving in these two capacities. Specifically I find that any action taken by Jonathan Snelling as president of PB which would increase the amount of money received by PB, would operate to the benefit of his father's estate. I likewise find that any action taken by Jonathan Snelling on behalf of PB which would reduce or minimize that amount would thereby have an adverse effect on the value of the shares owned by his father's estate.

I find that after the assignment for the benefit of creditors of Traps, Perkins and Jonathan Snelling attempted to sell the assets of Traps by private sale. A number of potential buyers were solicited by mail. An option was extended to

Marine Specialties Ltd. which allowed the option to expire. Subsequently the co-assignees sold the assets of Traps to Marine Specialties for $28,500 and they sold the other assets of Traps for a sum between $7,000 and $8,000, which brought the amount of cash realized by the liquidation of Traps to approximately $36,000. A breakdown of the distribution of this $36,000 was placed in evidence. It is composed of $5,000 to a judgment creditor who had obtained an execution therefor, payment of a priority tax claim in full, payment of a dividend of approximately $10,000 to unsecured business creditors, and compromise of an $84,000 obligation to PB in the amount of $10,000. In the course of the administration, loans made to Traps in the amount of $18,000 were waived entirely. The compromise of the PB claim of $84,000 was specifically passed on by Referee Hannon after notice to creditors was sent out by the bankruptcy court. The referee approved this compromise and no evidence was offered at the instant trial on the basis of which this Court will vacate or change Referee Hannon's ruling.

One of the plaintiff's complaints herein is that because an assignment for the benefit of creditors was used in liquidating Traps, no court has previously had occasion to rule on fees paid to attorneys Burwen and Perkins. Each attorney received approximately $3,900 in fees. There is no evidence before this court upon which a finding can be made that these fees were or were not excessive. Lastly, there is no evidence of concealment of either of these figures.

In considering the compromise of the $84,000 which ran from Traps to PB, over and above the fact that this was specifically approved by Referee Hannon, whose order has never been appealed from there is evidence which I accept that Traps was at all times an undercapitalized corporation. There is substantial authority for the position that advances made by a parent corporation to a subsidiary should be treated as an investment rather than as a loan. Treating the $84,000 as an investment rather than as an account receivable on the books of PB supplies an additional basis establishing the reasonableness of the settlement, over and above the Referee's approval.

Having made all of the above specific findings and rulings, it remains to say that plaintiff's entire case, tardily brought as it is, is keyed to one basic and overriding misassumption. That misassumption is that the bankruptcy of PB and a bankruptcy for Traps could and should have been brought at the same time, and should have been administered simultaneously as one bankruptcy, with that of Traps included in that of the parent corporation PB. Plaintiff further assumes in his argument that had this been done a substantially greater amount of money than that produced by the assignment would have been realized for the estate of PB which, of course, would have produced a larger dividend for the creditors of PB and would have substantially reduced the deficiency which the guarantors of the SBA note were called upon to pay and did pay.[1]

1. In an opinion handed down on December 15, 1970 in a case captioned Jonathan R. Snelling, et al. v. State Street Bank & Trust Co., et al., 358 Mass. 397, 265 N.E.2d 350, the Supreme Judicial Court ruled that Attorney William Herbits and Axel B. Gravem, and the estate of Henry B. W. Snelling, co-guarantors of the SBA loan to PB, were jointly and severally liable to the SBA for the balance owed to it on the PB note.

A demand upon Mr. Herbits for the entire amount of the loan was made by the SBA and is in evidence in this case. Under the decision of the Supreme Judicial Court the

economic burden sustained by Mr. Herbits as co-guarantor of the loan totaled at least $14,616.18. The entire deficiency was $38,470.54 plus interest.

Although it was denied at the trial by counsel for plaintiff, this Court cannot escape the conclusion that Mr. Herbits is the real party in interest herein. It was stated on the record that he offered to serve as counsel for the plaintiff without charging any fee for his services, and during the trial he frequently entered the bar enclosure to confer with counsel for plaintiff of record, Mr. Friedman, who appeared only on the

The fatal flaw in plaintiff's assumption is that it is contrary to such facts as have been established herein and it is contrary to the law. The record clearly indicates that PB was engaged in a type of business different from the business of Traps. The record also leaves no doubt that Traps and PB were legally and factually independent corporate operations. Traps was engaged primarily in the business of catching fish and offering its catch for sale. PB was engaged primarily in buying, freezing and then reselling fish. As noted above, both companies in the regular course of their respective businesses had two separate and unrelated groups of ordinary trade creditors. Consequently it would not have been legally proper to have consolidated bankruptcies for these two companies had a bankruptcy been used for Traps. This substantially destroys plaintiff's basic assumption. Maule Industries v. Gerstel, 232 F.2d 294, 297 (5 Cir. 1956). See Nichols & Co. v. Secretary of Agriculture, 131 F.2d 651, 656–57 (1 Cir. 1942); In re Unishops, Inc., 374 F. Supp. 424, 427–28 (S.D.N.Y.1974), aff'd 494 F.2d 689 (2 Cir. 1974); Fish v. East, 114 F.2d 177, 191 (10 Cir. 1940).

Equally fatal to plaintiff's contention herein is the fact that, if it be assumed that it would have been legal to consolidate the two bankruptcies, there is in the record no evidence which establishes by a preponderance or otherwise that, in fact, a greater recovery than that realized by the assignment for the benefit of creditors would have been obtained for the creditors of PB by the use of consolidated bankruptcies.

I rule that plaintiff has failed to sustain his burden of proof herein. I find that there has been no breach of any duty owed to plaintiff by the various parties defendant and, consequently, the complaint is dismissed.

---

last day of the trial shortly before he was scheduled to testify.

Lastly, it is probably not without significance that Mr. Friedman was attorney for other creditors during the time the Plymouth bankruptcy was pending before Referee Hannon and took no appeal on behalf of the creditors he represented therein from the order of the Referee approving the compro-mise of the $84,000 claim of PB against Traps. It is further significant that Mr. Friedman did not seek to revitalize this moribund litigation until July 24, 1972, which was well after the decision of the SJC. It also should be noted that Mr. Herbits was one of the three co-counsel who filed the complaint purportedly on behalf of Mr. Friedman.