VIRGINIA BOYD & others *vs.* BOARD OF REGISTRARS OF VOTERS OF BELCHERTOWN.[1]

Suffolk.    September 18, 1975. — September 30, 1975.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Elections. Constitutional Law,* Elections. *State Hospital. Words,* "Guardianship."

Mentally retarded persons who were never "adjudicated incompetent" or placed under guardianship under G. L. c. 201, but who voluntarily resided at a State-run public medical institution in a town, were not precluded from registering to vote by the provision in art. 3 of the Amendments to the Constitution of Massachusetts, as amended, and in G. L. c. 51, § 1, excluding "persons under guardianship" from the right to vote. [632-638]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 8, 1975.

The case was reserved and reported by *Hennessey,* J.

*Stephen J. Schwartz* for the plaintiffs.

*Frank Laski,* General Counsel, Department of Mental Health, for the Commissioner of the Department of Mental Health, amicus curiae, submitted a brief.

---

[1] Carl J. Peterson, clerk of the board of registrars of voters of Belchertown, was named as an individual defendant along with each other member of the board.

HENNESSEY, J.  In this case we hold that members of the certified class, including the plaintiffs, if otherwise qualified under the Constitution and laws of this Commonwealth, may not be precluded from registering to vote solely because they reside at a State-operated facility for mentally retarded persons.

The case is before us on a statement of agreed facts. The plaintiffs Virginia Boyd and Ida Montufesco are residents of the Belchertown State School (school), a State-run "public medical institution" established pursuant to G.L. c. 19, § 14A.  Both are mentally retarded.  G. L. c. 123, § 1.  G. L. c. 201, § 1.  They have resided at the school on a voluntary basis for, in each case, more than thirty years.  Neither plaintiff, according to the statement of agreed facts, has ever been "adjudicated incompetent" or placed under guardianship in accordance with the procedures established by G. L. c. 201.  On October 4, 1974, the plaintiffs, in the company of a paraprofessional employed by the Mental Retardation Project of Western Massachusetts Legal Services, went to the Belchertown registry of voters for the purpose of applying for registration to vote in general elections and the presidential primary.

Each plaintiff in turn informed the clerk of the board of registrars of voters of her name, age and residence at the school.  The clerk refused to register the plaintiffs on the ground that, as residents of the school, they and their fellow residents were "under guardianship" and thus ineligible for enrollment on the town's voter list.  Written requests directed to the full board of registrars (board) seeking reconsideration of the position taken by the clerk culminated in a response informing counsel for the plaintiffs that the board "unanimously voted to abide by the previous decision . . . because of the Board's interpretation that . . . [residents of the school] are under guardianship."

The plaintiffs sought review of the board's decision by filing the instant complaint in the county court.  They

further sought certification as a class of all those in like circumstances. A single justice certified the class and reserved and reported the case to the full court without decision. The full court ordered an expedited hearing of oral argument in the case.

We conclude that our holding need not resolve the due process or equal protection issues raised by the plaintiffs or the Department of Mental Health in its brief as amicus curiae.[2] The defendants contend that, since provisions of the State Constitution and the General Laws preclude registration of "persons under guardianship," mentally retarded persons residing at the State institutions may not register to vote. On the contrary, as we construe the "under guardianship" language of art. 3 of the Amendments to the Constitution of Massachusetts, as amended, and G. L. c. 51, § 1,[3] that language could not have been intended to foreclose competent adults from exercising the franchise. We cannot read the language loosely because to do so would tend to deprive numerous persons of a basic right of citizenship. See *O'Brien* v. *Election Comm'rs of Boston,* 257 Mass. 332, 338 (1926); *Swift* v. *Registrars of Voters of Quincy,* 281 Mass. 271, 277 (1932).

Although our decision is based on other grounds, we deem it instructive to summarize the plaintiffs' constitutional arguments. Both counsel for the plaintiffs and the Department of Mental Health as amicus curiae advance three contentions founded on perceived violations of our

---

[2] The Department of Mental Health, in a comprehensive amicus brief, supports the plaintiffs' position as to the legal issues, and also argues at length that the result urged by the defendants here would be socially undesirable as inconsistent with the total legislative scheme and the efforts of the department and the mentally retarded themselves to improve the capacities of such handicapped persons.

[3] The language of the statute parallels the wording of the constitutional amendment, providing in pertinent part that "every citizen eighteen years of age or older, not being a person under guardianship . . . may have his name entered on the list of voters . . . and may vote . . . in any . . . election . . .."

State and Federal Constitutions: (1) the board's action creates a classification which works a disproportionate injustice on the plaintiffs by depriving them of precious rights in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution; (2) the board's forced categorization of the plaintiffs and members of their class as under guardianship arbitrarily denies them access to the ballot without resort to established judicial procedures for doing so in violation of the due process guaranties of the State and Federal Constitutions; and (3) the board's equation of residency at a facility such as the school with incompetency establishes an irrebuttable presumption in violation of due process of law.

The plaintiffs contend, in pressing the equal protection argument, that voting is a fundamental right and that consequently the deprivation of that right mandates strict judicial scrutiny. The plaintiffs fail to see how the board can demonstrate a compelling interest in denying them the right to register and vote. The due process arguments rely on notions of fundamental fairness, attacking the lack of notice, opportunity to be heard, and alleged capriciousness inherent in the board's decision. We do not pass here on the persuasiveness or soundness of these arguments but turn instead to a discussion of the statutory and State constitutional provisions in dispute to determine whether the board's interpretation of them can stand.

1. The voter qualifications originally enumerated in the State Constitution concentrated on the sex, age, duration of residency and landholdings of those seeking to register to vote. See Mass. Constitution Part 2, c. 1, § 2, art. 2; Part 2, c. 1, § 3, art. 4; Part 2, c. 2, § 1, art. 3; Part 2, c. 2, § 2, art. 1 (1780). With the adoption of the third article of amendment in 1821, "persons under guardianship," along with other persons not relevant here, were excluded from the ranks of qualified voters.

This third article of amendment superseded the constitutional provisions for voter qualification and, although

it has been changed in substantial aspects over the years, has always retained the "under guardianship" disqualification. The same exclusion of those "under guardianship" was incorporated in a statute enacted shortly after the constitutional convention adjourned. St. 1822, c. 104, § 1 (now G. L. c. 51, § 1).

Although the intent of the delegates to the Constitutional Convention of 1821 and of the Legislature is nowhere expressed in historical documents,[4] we fail to discover any purpose on their part, in disqualifying persons "under guardianship," to propose a new definition for that term to apply solely to voting. Guardianship was then, and is today, a term of art which implies that prescribed statutory procedures will be strictly adhered to before an individual is subjected to the constraints on his person or property which that status connotes. Traditionally, guardianship was viewed as a court-imposed relationship between, usually, a minor or a person of unsound mind and a person or agency entrusted with the power to "control, preserve, and dispose of the property of their wards as these themselves, acting rationally, would do if *sui juris.*" J.G. Woerner, A Treatise on the American Law of Guardianship of Minors and Persons of Unsound Mind 2 (1897) (footnote omitted). The relationship followed legal proceedings in courts having jurisdiction of these matters in which the minor or person of unsound mind was declared incompetent to manage himself or his estate. *Id.* at 432. However, incompetence to manage one's affairs or one's estate, which could lead to the appointment of a guardian,

---

[4] The pertinent discussion of voter qualifications at the State Constitutional Convention of 1820-1821 indicates that the delegates were most preoccupied with settling on a pecuniary qualification. Journal of Debates and Proceedings in the Convention of Delegates Chosen to Revise the Constitution of Massachusetts 113-116, 121-125 (1st ed. 1821). The "under guardianship" wording was inserted rather casually and without discussion. *Id.* at 233 (motion of Mr. Varnum, of Dracut).

was never equated with commitment or admission to a mental health facility.

An early case contrasted the guardianship relationship with commitment in this way: "[T]he [guardianship] decree fixes the *status* of the ward as an insane person 'incapable of taking care of himself.' The statutes give the care and management of his person and estate to the guardian and take from him the capacity to make contracts or to transfer his property. The necessary effect of the decree is that the ward is in law . . . incapable of taking care of himself . . .. But . . . [a commitment order] is not of this character. It does not pretend to declare the person committed to the hospital to be incapable of transacting business. It does not take from him the care and management of his estate. It affords a justification for the restraint of his person, but is not designed to fix his *status*" (emphasis in the original). *Leggate* v. *Clark,* 111 Mass. 308, 310 (1873). Accord, *Dowdell, petitioner,* 169 Mass. 387, 388 (1897) (order of commitment as mentally ill not equivalent to appointment of guardian over person committed).[5]

We conclude that this long recognized distinction between placing a person under guardianship and placing him, or allowing him to place himself, in a mental health facility to seek treatment, is even more profound today than when the *Leggate* case was decided. Under modern statutes a mentally retarded person can be placed under guardianship only after adherence to a rigid scheme which incorporates action from the Probate Court and mental health specialists. See G. L. c. 201, § 6A, inserted by St. 1974, c. 845, § 4. By contrast, admission to and residence of mentally retarded persons at facilities such as the school are wholly voluntary. See G. L.

---

[5] We rely on the *Leggate* case only by way of analogy, particularly with reference to the institutionalization of persons. We recognize, of course, the vast difference between the mentally retarded and mentally ill. See G. L. c. 123, §§ 1, 2, 4, 23.

c. 123, § 10; Code of Human Services Regs., tit. 4, c. 2, § 211.02. The Legislature has indicated in other statutes its general intent to preserve the basic rights of the mentally retarded notwithstanding their admission or commitment to one of these facilities. G. L. c. 123, § 23. G. L. c. 123, § 25. See Walker, Mental Health Law Reform in Massachusetts, 53 B. U. L. Rev. 986, 989 (1973).[6]

We express no opinion as to the validity under the Federal Constitution of the exclusion as voters of persons "under guardianship" even as we have narrowly construed that term in this opinion. That constitutional question is not presented in this case. We do note, however, that the State Constitution and the laws examined here are conspicuously silent on the standard of mental competence demanded of a prospective voter other than to require that he complete a prepared affidavit and sign it or "make his mark." G. L. c. 51, § 44, as appearing in St. 1973, c. 1137, § 9. It is true that in the prepared form the affiant is required to swear that he or she is not a person under guardianship, G. L. c. 51, § 36, but this, as we have said, means nothing more than an affirmance that a court has not declared him incapable of managing his own affairs.

2. It follows from all we have said that the defendants are wrong in their contention that persons are ineligible to vote merely because of their residency at the school. The case is remanded to the county court, where a judgment is to enter declaring that the plaintiffs and the

---

[6] We note with some interest that the Department of Mental Health has adopted the following regulation: "No person shall be deprived of the right to manage his affairs, to contract, to hold professional, occupational or vehicle operator's licenses, to make a will, to marry, to hold or convey property, or to *vote in local state, or federal elections solely by reason of his admission or commitment to a facility* except where there has been an adjudication that such person is incompetent, or when a . . . guardian has been appointed for such person . . . ." Code of Human Services Regs., tit. 4, c. 2, § 221.02.

members of the certified class are entitled to be registered to vote if they are otherwise eligible to vote.[7]

*So ordered.*

---

[7] The plaintiffs also seek a permanent injunction against the defendants' illegal refusal to register them. We are confident that, in light of the declaration of rights established here, no such injunction is necessary and that the plaintiffs and the members of the class will be afforded their rights without further recourse to the courts.