JAMES FAZIO, SR. & another *vs.* JAMES FAZIO, JR.

Middlesex. December 7, 1977. — June 19, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Insanity. Guardian,* Insane person, Temporary guardian.

A probate judge's finding that the respondent in a proceeding under G. L. c. 201, § 6, was in need of a permanent guardian "due to mental illness" was insufficient to satisfy the statutory requirement that a person be found incapable of taking care of himself by reason of mental illness. [398-400]

Where a Probate Court judge erred in appointing a permanent guardian pursuant to G. L. c. 201, § 6, his appointment of a temporary guardian pursuant to § 14, which was based solely on his prior appointment of the permanent guardian, was also error. [400]

Evidence at a hearing on petitions for appointment of temporary and permanent guardians pursuant to G. L. c. 201, §§ 6 and 14, including evidence that the respondent had been diagnosed at various times as having an "obsessive compulsive neurosis," "phobia," "psychoneurosis," "schizophrenic personality," and "definite mental illness," was insufficient to warrant a finding that the respondent was incapable of taking care of himself by reason of mental illness or that his welfare required the immediate imposition of a temporary guardian. [400-405]

This court declined to consider a challenge to the constitutionality of G. L. c. 201, §§ 6 and 14, authorizing the appointment of guardians, where decrees appointing a temporary and permanent guardian under those sections were vacated on other grounds. [405-406]

PETITION filed in the Probate Court for the county of Middlesex on January 22, 1970.

---

The case was heard by *Sullivan*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Jeanne Baker* for James C. Fazio, Jr.

*Richard L. Neumeier (Philander S. Ratzkoff* with him) for James Fazio, Sr., & another.

*William J. O'Neil, Ellen Davis & Kathleen Haley,* for Mental Health Legal Advisors Committee, amicus curiae, submitted a brief.

QUIRICO, J. These are two appeals by James Fazio, Jr. (James), from decrees entered in the Probate Court for Middlesex County, one placing him under guardianship pursuant to G. L. c. 201, § 6, as appearing in St. 1956, c. 314, § 2,[1] and a second appointing a temporary guardian for him pursuant to G. L. c. 201, § 14, as appearing in St. 1956, c. 314, § 7.[2] For the reasons stated below we vacate both decrees.

The procedural background of the case is as follows. On January 22, 1970, James Fazio, Sr., and John A. Fazio (plaintiffs), the father and younger brother of James, filed a petition in the Probate Court for Middlesex County seeking appointment of a guardian for the then thirty year old James, pursuant to G. L. c. 201, § 6. The petition alleged that James was a "mentally ill person, and incapable of taking care of himself." The action was consolidated for hearing with an action for separate support brought by Minnie Fazio, the mother of James, against James Fazio, Sr. The consolidated hearing was commenced on April 13, 1971, and the judge entered a decree on June 8, 1972, appointing

---

[1] This section has since been amended by St. 1974, c. 845, § 3, with regard to parties who may petition to have a guardian appointed, and by St. 1977, c. 567, § 1, with regard to procedures for the commitment of those under guardianship.

[2] This section has also been amended by St. 1974, c. 260, § 28, which effected a minor change in terminology, by St. 1976, c. 277, which made the section applicable to the mentally retarded, and by St. 1977, c. 567, § 3, which established procedures for the commitment of those under temporary guardianship, and other procedures as to appointment in general.

a guardian. James seasonably appealed from that decree. On October 11, 1972, the plaintiffs petitioned under G. L. c. 201, § 14, for the appointment of a temporary guardian for James pending resolution of the appeal and that petition was allowed on the same date. James also seasonably appealed from that decree.

On November 22, 1972, James requested a report of the material facts, which the judge filed on April 11, 1974. On December 5, 1974, a motion was filed for the appointment of a guardian ad litem to determine whether James should be permitted to pursue his appeals, and it was allowed on January 7, 1975. On July 8, 1975, the guardian ad litem filed a report in which he assented to the prior claims of appeal by James, stating, in part, "I am unable to say that an appeal would be frivolous and I believe it would be in James' best interest and emotional stability that it be done."

On May 5, 1977, the parties filed a joint application for direct appellate review, and on May 31, 1977, we granted the application. G. L. c. 211A, § 10 (A).

We summarize the material facts concerning James's personal and psychological history as found and reported by the judge. James was one of two sons of James, Sr., and Minnie Fazio, a couple who had lived all of their married lives in Medford, Massachusetts. During his years in grammar and high school, James was a brilliant student. As a result he apparently had an opportunity to attend Yale University, but because his mother did not wish him to be so far away from home, he instead enrolled at Tufts University in Medford. He attended Tufts for only two months, after which time he dropped out and joined the United States Navy without the consent of his parents. However, due to deep emotional stress, he was unable to go through basic training and was sent by the Navy to Philadelphia for treatment. At that time, James was suffering from an obsession of contamination and was found to be in need of further treatment. When James was discharged from the Navy on March 7, 1960, he did not go home, but instead spent six weeks living at the Essex Hotel in Boston.

James developed a neurosis about contamination. When once again living at home, he would spend all of his time cleaning such things as his automobile, the kitchen stove, and the refrigerator, due to his feelings that people would become infected. His cleaning of the kitchen stove, which he ultimately dismantled and threw away, delayed the sale of the family house for some time. James would remonstrate and fight with his brother, John, for contaminating the refrigerator, as a result of which there was much dissension between the two brothers. In one incident, James objected to his father's washing of the windows of the family house because he thought the cloth being used had termite poison on it.

As James's condition seemed to worsen, his father begged him to see a psychiatrist. James refused and his mother supported such a refusal. James had always shown an intense hate for his father, and, for the years involved, his mother had been overly protective of him, not allowing him to follow his father's advice. Finally, after further encouragement, James did see Dr. Tillotson, a psychiatrist from Belmont.[3] A long history of James's condition, and of his actions at home and in the Navy hospital, was given to Dr. Tillotson. James was treated three to four times a week in 1961-1962, and was diagnosed at the time as having a definite mental illness, psychoneurosis and schizophrenic personality. Dr. Tillotson recommended that James be treated in a hospital because he had a phobia and obsession concerning contamination. Subsequently, the doctor stated that without hospital treatment further private treatment in the office was hopeless.

During this time period, James's father had suggested on several occasions that James come to work with him. How-

---

[3] Dr. Tillotson had graduated from the University of Vermont Medical School in 1921, had been superintendent of McLean Hospital in 1930-1932, studied psychiatry abroad in 1932-1934, and subsequently returned to McLean Hospital. He also had been in private practice, on the staff of Massachusetts General Hospital, and had taught at the Harvard Medical School.

ever, James would not work, and on February 18, 1965, Dr. Tillotson gave James a certificate stating that he was unable to work due to mental illness. On December 8, 1970, Dr. Tillotson once again diagnosed James as having a schizophrenic personality, an obsession about contamination, and a definite mental illness. At the hearing on the petition for the appointment of a guardian, Dr. Tillotson recommended that a guardian be appointed to take care of James and his belongings.

The judge concluded his report of the material facts by stating, "I observed James very closely on the stand and at the hearing. He showed an intense hate for his father. I feel he is in need of a guardian due to mental illness."

James raises a number of issues on appeal. He contends that (1) (a) the appointment of a permanent guardian was error because the judge did not specifically find that James was "incapable of taking care of himself by reason of mental illness" as required by G. L. c. 201, § 6, and (b) the appointment of a temporary guardian was error because the judge did not find, as prescribed by G. L. c. 201, § 14, that James's "welfare" required the "immediate" imposition of a temporary guardian; (2) the appointment of both a permanent and temporary guardian was error because, on the examination of the record as a whole, there is insufficient evidence to permit either of the findings required by G. L. c. 201, §§ 6 and 14; and (3) G. L. c. 201, §§ 6 and 14, on their face and as applied, unconstitutionally deprive him of the rights of due process and equal protection, secured by the Fourteenth Amendment to the United States Constitution, and by arts. 1, 10, and 12 of the Declaration of Rights of the Constitution of Massachusetts. We consider these issues below.

1. (a) The pertinent provisions of G. L. c. 201, § 6, in force at the time of the hearing and decision in this case, provide that if, after a petition is filed in the Probate Court seeking the appointment of a permanent guardian, notice is given and a hearing held, "the court finds that [a person] is incapable of taking care of himself by reason of mental ill-

ness, it shall appoint a guardian of his person and estate."
James contends that because the judge did not specifically
find that he was "incapable of taking care of himself by
reason of mental illness," the ultimate finding that he was in
need of a guardian, and the subsequent appointment of
such a guardian was error. We agree.

On appellate review of this proceeding, where a report of
the material facts has been filed pursuant to the require-
ment of G. L. c. 214, § 23, repealed by St. 1973, c. 1114,
§ 62, we will not disturb the findings made by the judge
below unless they are plainly wrong. However, inasmuch as
we have the duty to examine all of the evidence, we can find
facts not expressly found by the judge, and can reverse the
judge's conclusion if it is tainted by some error of law. See
*Commonwealth* v. *DeCotis*, 366 Mass. 234, 236 (1974); *All
Stainless, Inc.* v. *Colby*, 364 Mass. 773, 776 (1974); *Rich-
mond Bros.* v. *Westinghouse Broadcasting Co.*, 357 Mass.
106, 109 (1970); *Willett* v. *Willett*, 333 Mass. 323, 324
(1955).

Here, we need not look further than the face of the
reported facts to determine the presence of error. General
Laws c. 201, § 6, is explicit as to the nature of the finding re-
quired for the appointment of a permanent guardian. The
prerequisite finding is two-fold: a person (1) must be found
incapable of taking care of himself, (2) by reason of mental
illness.[4] See *Russell* v. *Russell*, 336 Mass. 762, 763 (1958);
*Willett* v. *Willett, supra* at 330; *Bashaw* v. *Willett*, 327
Mass. 369, 370 (1951). A finding of mental illness alone, or,
as here, a finding that a person is in need of a guardian "due
to mental illness," is not sufficient. Clearly, the requirement
that a mentally ill person be found incapable of taking care
of himself lies at the very heart of a guardianship proceed-
ing. As this court stated long ago, "the [guardianship]
decree fixes the *status* of the ward . . . . The necessary effect
of the decree is that the ward is in law . . . incapable of tak-

---

[4] The second phrase, "by reason of mental illness," was inserted in the
statute by the 1956 amendment.

ing care of himself, as to all the world" (emphasis in original). *Leggate* v. *Clark*, 111 Mass. 308, 310 (1873). See *Boyd* v. *Registrars of Voters of Belchertown*, 368 Mass. 631, 636 (1975); J.F. Lombard, Probate Law and Practice § 906 at 370-371 (1962).

A decree appointing a permanent guardian, which is based on subsidiary or ultimate findings which fail to satisfy the statutory requisite, cannot stand. Inasmuch as the report of material facts does not contain the required finding that James is incapable of taking care of himself by reason of mental illness, the ultimate finding that he is in need of a guardian is plainly wrong, and the resulting decree appointing the permanent guardian is error.

(b) James also contends that because the judge did not find in the report of material facts that his welfare required the "immediate" imposition of a temporary guardian — a finding required by G. L. c. 201, § 14 — the appointment of the temporary guardian must fail. We agree. We hold that the appointment of the temporary guardian, absent the findings required by the statute, is error. The appointment of the temporary guardian was merely an interim matter, based solely on the prior appointment of the permanent guardian, which we have now determined was erroneous.[5] As such, it cannot be sustained.

2. James contends further that, even on an examination of the record as a whole rather than just the finding by the judge, there is insufficient evidence to permit either of the findings required by G. L. c. 201, §§ 6 and 14. The plaintiffs argue to the contrary, claiming that although the judge did not explicitly find in the reported facts that James was incapable of taking care of himself by reason of mental illness, or that James's welfare required the immediate imposition of a temporary guardian, the evidence would clearly support such findings.

---

[5] See Rule 29B of the Probate Courts (1975), which provides that a temporary appointment of a guardian or conservator will not be allowed unless a permanent petition has been filed and is being prosecuted.

These arguments by the plaintiffs could, in some circumstances, require us to consider the threshold question of the standard of proof which the plaintiffs must satisfy in proceedings under G. L. c. 201. We have recently held that the proper standard of proof to be applied in cases of commitment for mental illness, under G. L. c. 123, §§ 7 and 8, is "proof beyond a reasonable doubt." *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 276-277 (1978). In *Hagberg,* we determined at the outset that in mental commitment proceedings, where defendants stood to lose their freedom and to be labeled as mentally ill, there was a need for a standard of proof higher than the mere "preponderance of the evidence" standard. *Id.* at 275. We differentiated the "higher" standards of "clear and convincing proof" and "proof beyond a reasonable doubt," noting the former to be less demanding and of questioned utility. *Id.* at 275-276. See *Callahan* v. *Westinghouse Broadcasting Co.,* 372 Mass. 582, 588-589 (1977) (Quirico, J., dissenting); *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 871 (1975); *Kidder* v. *Greenman,* 283 Mass. 601, 613-614 (1933). In holding that the proper standard of proof to be applied for a commitment under G. L. c. 123 was "proof beyond a reasonable doubt" — the highest standard — we relied on our earlier decision in *Andrews, petitioner,* 368 Mass. 468, 486-491 (1975), wherein we had held that the commitment of a "sexually dangerous person" under G. L. c. 123A, due to the restraint of liberty and stigma involved, must rest on such proof. In view of the "'generally similar function and effects' of G. L. c. 123 and G. L. c. 123A," we held in *Hagberg* that the standard of proof beyond a reasonable doubt was applicable to c. 123 proceedings. *Hagberg, supra* at 276-277, quoting from *Andrews, petitioner, supra* at 480.[6]

We do not think it necessary to have protracted discussion of the applicable standard of proof in guardianship proceed-

---

[6] For cases in other jurisdictions employing the standard of proof beyond a reasonable doubt in mental commitment proceedings, see citations noted in *Hagberg, supra* at 276-277, and *Andrews, petitioner, supra* at 490.

ings which do not necessarily or directly involve or result in a commitment, because, in the particular circumstances of this case, the evidence, viewed in the light most favorable to the plaintiffs, does not warrant the findings mandated by G. L. c. 201, §§ 6 and 14, regardless of which standard of proof is applicable.

Admittedly, the record reveals a history of rather bizarre behavior on the part of James. From the time of his hospitalization in the Navy in 1960 to the filing of the guardianship petition in 1970, he exhibited an obsession with poison and contamination. As stated in the judge's findings and amplified in the record, James was diagnosed at various times as having an "obsessive compulsive neurosis," "phobia," "psychoneurosis," "schizophrenic personality," and "definite mental illness," in connection with his fears of contamination. The net effect of James's obsession was that he was quite difficult to live with. His anxieties about contamination were the source of many confrontations between him and his father, as well as his brother. On occasions, such confrontations severely disrupted normal family life in the Fazio home. In fact, the final series of events leading to the 1970 departure of James and his mother from the family home, the separation of his parents, and the eventual filing of the guardianship petition, stemmed, in part, from a confrontation based on James's obsession.

However, evidence of this type of behavior on the part of James, and the resulting strife among family members, does not, in and of itself, show either James's inability to take care of himself by reason of mental illness, G. L. c. 201, § 6, or that his welfare required the immediate imposition of a temporary guardian, G. L. c. 201, § 14. The phrase "incapable of taking care of himself by reason of mental illness" is not defined within the body of G. L. c. 201, § 6. And, cases decided thereunder have generally considered only the facts necessary to sustain a finding of "mental illness," and have not lent specific definition to the terms "incapable of taking care of himself." See *Willett* v. *Willett*, 333 Mass. 323, 325-330 (1955); *Bashaw* v. *Willett*, 327 Mass. 369, 370-371

(1951). See also *Cogan* v. *Cogan*, 202 Mass. 58, 60 (1909). However, in *Russell* v. *Russell*, 336 Mass. 762, 763 (1958), we upheld the appointment of a guardian under G. L. c. 201, § 6, on a finding that a ward was "so mentally ill that he [*could not*] *handle his own affairs* and he need[ed] not only a guardian of his property but also a guardian of his person" (emphasis added). In *Boyd* v. *Registrars of Voters of Belchertown*, 368 Mass. 631 (1975), a case concerning the voting rights of persons residing at a State facility for the mentally retarded, we addressed the nature of the guardianship relationship. Quoting language from *Leggate* v. *Clark*, 111 Mass. 308, 310 (1873), cited earlier in this opinion, we stated, "the [guardianship] decree fixes the *status* of the ward as an insane person 'incapable of taking care of himself.' The statutes give the care and management of [the] person and estate [of the ward] to the guardian and take[s] from [the ward] the capacity to make contracts or to transfer his property" (emphasis in original). *Boyd*, *supra* at 636. In *Boyd*, we held further that an affidavit of a prospective voter containing the sworn statement that he is not under guardianship, G. L. c. 51, § 36, "means nothing more than an affirmance that a court has not declared him *incapable of managing his own affairs*" (emphasis added). *Id.* at 637. In view of the holdings of these cases, we think it reasonable to interpret the statutory phrase "incapable of taking care of himself by reason of mental illness," as encompassing a general inability on the part of an individual to manage his own person and financial affairs, such inability being caused by mental illness. We think the type of evidence necessary to support such a finding, apart from evidence as to mental illness, should consist of facts showing a proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare, or to make informed decisions as to his property or financial interests.[7] Cf. G. L. c. 201, § 6A, as amended by

---

[7] Although conservators, appointed pursuant to G. L. c. 201, §§ 16, 16A, 21, and 27, have the basic duties of management and control of the

St. 1977, c. 567, § 2 (appointment of guardians of mentally retarded persons); G. L. c. 201, § 8, as amended by St. 1974, c. 260, § 27 (appointment of guardians of spendthrifts); J.F. Lombard, Probate Law and Practice § 941 at 456 (1962). Likewise, in determining whether, under G. L. c. 201, § 14, the "welfare" of a proposed ward requires the immediate imposition of a temporary guardian, the factors noted above should be considered. The question to be addressed is whether an individual, for whom a guardian is proposed, is so incapable of handling his personal and financial affairs as to warrant the immediate appointment of a temporary guardian.

There was little or no evidence of this type presented at James's guardianship hearing. Although the judge found that Dr. Tillotson had certified James's inability to work due to mental illness, there was other evidence proffered that currently, as well as in the past, there was no economic necessity for James to be employed. Moreover, there was additional evidence introduced which tended to show James's ability to function at a more-or-less normal level, in spite of his obsession about contamination. For example, James testified that during the course of his problems with contamination, he had nevertheless cared for and nursed his ailing grandfather, as well as engaged in self-educational studies of his grandfather's ailments. He also testified as to his ability to adjust to apartment living and to use public facilities, in spite of his concerns regarding contamination. In addition, Dr. Tillotson testified at the hearing that he had observed nothing unusual about James's demeanor or conduct, apart from his concerns with contamination, and

property of a ward (G. L. c. 201, § 20, as amended by St. 1974, c. 845, § 11), guardians, who have custody of the person, have additional duties pertaining to the "maintenance and support" of the ward. J.F. Lombard, Probate Law and Practice § 906, at 372 (1962). Although "[t]he guardian does not have title nor own any of the ward's estate . . . [he] has the responsibility of the management and care of all of the estate of the ward" (footnotes omitted). Id. See G. L. c. 201, § 12, as amended by St. 1974 c. 845, § 6.

that James was capable of taking care of himself "[i]n the ordinary manner that implies personal hygiene and so forth." Based on this record, devoid of any significant evidence showing James's inability to make informed decisions as to his health,[8] safety, welfare, property or financial interests, we do not think findings that James was incapable of taking care of himself by reason of mental illness, or that his welfare required the immediate imposition of a temporary guardian, would be warranted.[9]

3. James also contends that G. L. c. 201, §§ 6 and 14, on their face and as applied, unconstitutionally deprive him of the rights of due process and equal protection, secured by the Fourteenth Amendment to the United States Constitution, and arts. 1, 10, and 12 of the Declaration of Rights of the Constitution of Massachusetts. As most recently reiterated in *Commonwealth* v. *Bartlett,* 374 Mass. 744, 748-749 (1978), "[a] court will ordinarily 'not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. . . . Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. . . . "When the validity of an act . . . is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U.S. 22, 62 [1932].' *Ashwander* v. *Tennessee Valley*

---

[8] We cannot say that James's obsession about contamination and his meticulous living and eating habits were ruinous to his health.

[9] Although the parties, as well as the amicus Mental Health Legal Advisors Committee, have argued extensively in their briefs as to the correctness of the judge's finding that James was mentally ill, we need not address that issue. Because we hold that there was insufficient evidence to support a finding that James was *incapable of taking care of himself* by reason of mental illness, or that his welfare required the appointment of a temporary guardian, the appointments of both the permanent and temporary guardian must fail.

*Auth.*, 297 U.S. 288, 347-348 (1936) (Brandeis, J., concurring). See *United States*, v. *UAW*, 352 U.S. 567, 590 (1957); *Burton* v. *United States*, 196 U.S. 283, 295 (1905); *School Comm. of Springfield* v. *Board of Educ.*, 366 Mass. 315, 334-338 (1974) (Quirico, J., concurring); *First Nat'l Bank* v. *Attorney Gen.*, 362 Mass. 570, 592-597 (1972) (Quirico, J., concurring), and cases cited therein." Thus, because our conclusions as to James's first two claims are based on an interpretation and application of G. L. c. 201, §§ 6 and 14, which results in a holding favorable to him and dispositive of the case, we believe it is unnecessary to consider or pass on the constitutional questions raised.

For all of the reasons discussed above the decrees appointing a permanent and a temporary guardian for James are vacated.

*So ordered.*