**In the Matter of:**
**Guardianship of**
**Doria RONDEAU**

**No. 51209**

Probate and Family
Court/Hampshire, ss.
Commonwealth of Massachusetts

Peter Clark, counsel for partitioner.
William Newman, counsel for ward.
Nancy Braxton, counsel Ad Litem.

## FINDINGS OF
## CONCLUSIONS OF LAW,
## RESERVATION AND REPORT
## TO APPEALS COURT

On May 28, 1982, the Department of Mental Health filed a motion with this Court pursuant to G.L. c. 201, sec. 14, requesting the appointment of a temporary guardian for Doria Rondeau, an allegedly mentally ill individual and patient at Northampton State Hospital, who at that time was under a ten-day commitment pursuant to G.L. c. 123, sec.

12(e). In its motion, the Department requested that Paulette Gallese, the daughter of Doria Rondeau, be appointed temporary guardian. As required by Probate Court Rule 29B, the Department's motion was accompanied by a petition for permanent guardianship, which did not name any specific individual but instead requested the appointment of "some suitable person" as permanent guardian of Doria Rondeau.

At the time of hearing regarding the temporary guardianship appointment, the Department of Mental Health submitted an affidavit by Dr. Steliana Naumescu of Northampton State Hospital, which indicated that Doria Rondeau's physical condition was in jeopardy because she was refusing food. Dr. Naumescu's affidavit further indicated that Doria Rondeau was in need of IV fluids, sedation to maintain IV fluids, administration of neuroleptic medication, specifically haldol, antiemetics, and diagnostic medical tests. The affidavit stated that without such medical treatment, Doria Rondeau's physical condition would deteriorate "to the point of demise."

On May 28, 1982, this Court granted the Department's motion and appointed Paulette Gallese as temporary guardian and authorized her to consent to needed medical treatment (see Findings and Decree of May 28, 1982); including the forcible administration of antipsychotic medication, if necessary, to stabilize the ward's condition. The temporary guardianship appointment was for a thirty-day period.

Additionally, on May 28, 1982, this Court appointed a guardian ad litem pursuant to G.L. c. 201, sec. 34, to represent the interests of the ward. On June 21, 1982, the guardian ad litem filed her initial report with this Court and also filed a motion for the appointment of counsel for the ward. On June 22, 1982, this Court appointed counsel to represent Doria Rondeau.

On June 24, 1982, the Department of Mental Health orally requested that this Court extend the temporary guardianship, including the authority to forcibly medicate, for a period of thirty (30) days beyond the original expiration date of June 26, 1982. Such request was denied pending a further hearing in this matter. On June 24, 1982, this Court issued a pre-trial order which, among other things, indicated that a 'substantial question exists as to the applicability of the criteria and procedures set forth by the Supreme Judicial Court in its decision **In the Matter of Guardianship of Richard Roe, III,** Mass. Adv. Sh. (1981) 981, 421 N.E. 2d 40 (1981), to the proceedings before this Court' and involving an involuntarily committed mental patient.

By way of response to this Court's pre-trial order, the parties, including the guardian ad litem, submitted an agreed statement of facts. A further hearing on this matter was held on July 22, 1982, and thereafter continued to August 3 and 4, 1982. Pursuant to G.L. c. 201, sec. 6, this Court appointed Dr. Timothy Rowe of Amherst to conduct an independent psychiatric examination of Doria Rondeau and to report his conclusions to the Court. At the time of hearing, witnesses included Dr. Jeffrey Geller, a psychiatrist at Northampton State Hospital, Dr. Timothy Rowe, and Ms. Paulette Gallese. Throughout the course of these proceedings, it has been the position of counsel for the ward that any continued authorization by this Court of treatment by means of the forcible administration of antipsychotic medication is unwarranted.

Based upon all of the evidence presented at hearing, both testimonial and documentary, and the reasonable inferences drawn therefrom, as well as the stipulated set of facts, I find the material facts to be as follows:

1. Doria Rondeau was born in North Adams, Berkshire County, Massachusetts, on November 8, 1927. Her present age is fifty-four (54).

2. Doria Rondeau lived at home with her parents until her marriage at age

sixteen (16). There were three children born of her marriage: Paulette Gallese, age thirty-six (36), presently living in Northampton, Massachusetts; Oliver Rondeau, age thirty (30), presently living in southern Vermont; and Anthony (Tony) Rondeau, age thirty-five (35), a mentally retarded individual, presently living in a group home in Easthampton, Massachusetts. Doria Rondeau's husband died in 1960 of diabetic complications.

3. Paulette Gallese has had an ongoing and caring relationship with her mother. Although she is willing to act as temporary guardian in this matter, she is planning to move to California in October of this year. The Department of Mental Health has not requested that Paulette Gallese be appointed permanent guardian of her mother. As stated above, at the present time, the Department of Mental Health does not have a proposed permanent guardian.

4. On May 24, 1982, Doria Rondeau was committed to Northampton State Hospital by the Northampton Division of the District Court of the Commonwealth, pursuant to G.L. c. 123, sec. 12(e), upon application of Doria Rondeau's landlady.

5. Following this Court's findings and decree appointing a temporary guardian on May 28, 1982, and the specific authorization to consent to medical treatment contained therein, on June 1, 1982, the temporary guardian authorized the forcible administration of medication to the ward, specifically haldol by intramuscular injection. From June 1 to June 9, 1982, the ward was administered 5 mg. of haldol two times per day. From June 10 to June 15, 1982, the ward was administered 7.5 mg. haldol twice per day. On June 15, 1982, the prescription was changed to prolixin, to be administered forcibly by intramuscular injection. This forced medication by injection occurred on June 15, 1982, 12.5 mg. prolixin and on June 22, 1982, 25 mg. of prolixin. The antipsychotic medications were administered pursuant to the recommendations of the treating medical staff at Northampton State Hospital.

6. On June 10, 1982, Doria Rondeau was committed to Northampton State Hospital by the Northampton District Court pursuant to G.L. c. 123, secs. 7, 8, upon a finding that Doria Rondeau is mentally ill and that failure to retain her in a facility would create a likelihood of serious harm. The order of commitment expires on December 10, 1982.

7. Prior to her commitment in May of 1982, Doria Rondeau lived in an apartment in Easthampton, Massachusetts, and cared and provided for her mentally retarded son, Tony. She had three previous brief psychiatric hospitalizations in the past thirteen years:

(1) July 15, 1969, to August 27, 1969, at Worcester State Hospital;
(2) October 2, 1971, to March 13, 1972, at Northampton State Hospital (there being extensive overnight visits the last two months of this hospitalization) and
(3) August 27, 1981, to November 27, 1981, at Northampton State Hospital.

8. Regarding the most recent hospitalization on May 24, 1982, upon admission, Doria Rondeau was "very uncooperative" and "in a very bad hygiene." She was "mute and resistant to care. She refused nutrients and medical care such as lab work and medication for her physical and mental condition. She was assaultive to staff . . ." See Petitioner's Exhibit 1.

9. Physically, Doria Rondeau was suffering from dehydration. For the first few days following admission, Doria Rondeau refused, with little exception, liquids or solid nourishment. She had recurrent spells of vomiting and, as stated above, was periodically assaultive when approached by medical staff.

10. On May 27, 1982, Doria Rondeau was transferred to the infirmary unit at Northampton State Hospital. Intravenous fluids were administered. On May 28, she was catheterized due to her failure to void

urine. Later on that day, she was taken by ambulance to Cooley Dickinson Hospital in Northampton for emergency evaluation. Afterwards, she was returned to the infirmary at Northampton State Hospital with treatment by intravenous fluids to continue for her dehydration. While at the infirmary, wrist restraints were utilized in order to administer the intravenous fluids.

11. Prior to her most recent commitment and while living at home, Doria Rondeau steadily deteriorated over a period of several months to the point where psychiatric hospitalization was necessary. At times, she was observed constantly pacing. On other occasions, she stayed in bed, indicating that she was sick. She neglected her personal hygiene, wore the same clothes, and did not leave her apartment. She did not know what day it was. She stopped wearing her glasses, which she needed to see properly. She ceased cleaning her apartment, which ultimately resulted in her landlady's calling the Department of Public Health. Because Doria Rondeau did not leave her apartment even to buy groceries, Paulette Gallese brought food for her mother and brother two or three times per week. Throughout this period, Doria Rondeau was living with her mentally retarded son, Tony.

12. Prior to past hospitalizations, Paulette Gallese observed that her mother experienced similar types of deterioration.

13. At approximately the end of February or beginning of March, 1982, Paulette Gallese noticed that her mother, Doria Rondeau, had stopped taking the antipsychotic medication which had been prescribed for her. From that period of time up to the most recent hospitalization, Paulette Gallese spoke with her mother on at least a dozen occasions regarding the prescribed antipsychotic medication.

14. In her present deteriorated condition, Doria Rondeau cannot effectively communicate or otherwise interact with her daughter, Paulette Gallese. In the past, however, including the period prior to February or March, 1982, when Doria Rondeau has taken antipsychotic medication as prescribed, she has been able to live independently and to communicate and interact with her daughter.

15. Prior to her current hospitalization, Doria Rondeau expressed to Paulette Gallese, on several occasions, a dislike for the State Hospital.

16. In approximately December of 1981, Doria Rondeau was examined by a Dr. Redstone, who observed that Doria Rondeau was "stiff" and "logy" due to overly high dosages of haldol. As a result, Dr. Redstone reduced the dosage of the antipsychotic medication prescribed for Doria Rondeau.

17. Pursuant to this Court's order of July 26, 1982, Dr. Timothy Rowe examined Doria Rondeau on August 2, 1982, at Northampton State Hospital.

18. In response to Dr. Rowe's questioning about food and drink, Doria Rondeau stated that God tells her what to eat, that she talks to God, and that food talks to her.

19. In response to Dr. Rowe's questions regarding medication, Doria Rondeau stated that it would cripple her insides and that she would die within four days. Doria Rondeau also stated that she had been told by her previous physician, a Dr. Rouse, not to take the medication.

20. Based upon his examination, it is Dr. Rowe's opinion that Doria Rondeau's psychotic delusional system controls her decisions regarding food and drugs. Dr. Rowe further considers Doria Rondeau's present psychotic condition to be chronic.

21. The proposed treatment at this time is an injectable form of antipsychotic medication such as prolixin. It is the opinion of Dr. Rowe that if Doria Rondeau were now in the community, she would become increasingly delusional and deteriorate. It is also Dr. Rowe's opinion that if Doria Rondeau is to remain in the State Hospital, without medication, with constant coaxing by the nursing staff regarding food and drink, she can be maintained indefinitely in her present marginal condition.

22. Dr. Rowe further indicated, as to the manner of forcibly medicating the ward in the event of her refusal, that after being approached by a nurse and asked to take the medication, the ward would be temporarily restrained by physical holding by hospital staff for the brief period of injection.

23. It is the opinion of Dr. Rowe that Doria Rondeau's prognosis without antipsychotic medication is one of indefinite care by the State in a hospital setting. Dr. Rowe considers Doria Rondeau's prognosis with antipsychotic medication to be potentially one of dramatic improvement, with ultimate discharge from Northampton State Hospital to the community.

24. Dr. Jeffrey Geller has also met with Doria Rondeau on several occasions during her most recent hospitalization. At the time of hearing, however, Dr. Geller was not Doria Rondeau's primary treating physician. During the course of Dr. Geller's examination on July 22, 1982, Doria Rondeau stated to Dr. Geller that medication is poison. Upon Dr. Geller's questioning regarding her son, Tony, Doria Rondeau stated that she was no longer concerned about her son.

25. For at least part of the period of hospitalization at Northampton State Hospital in 1981, Dr. Geller was Doria Rondeau's treating physician. At the time of this hospitalization, Doria Rondeau stated to Dr. Geller that she believed that the antipsychotic medication which she had taken in the past was the cause of her cancer (see paragraph 31 below). According to Doria Rondeau, for this reason, she ceased taking her medication prior to such hospitalization.

26. It is Dr. Geller's opinion that Doria Rondeau is mentally ill. Although, according to the medical records, Doria Rondeau's established diagnosis is schizophrenia, chronic undifferentiated, it is Dr. Geller's diagnosis that Doria Rondeau suffers from either paranoia or schizophrenia, paranoid type.

27. It is Dr. Geller's further opinion that Doria Rondeau is not capable of taking care of herself and does not have the capacity to make medical decisions. Dr. Geller considers Doria Rondeau's refusal of treatment to be rooted in her delusional system.

28. Despite the above, Doria Rondeau is aware that she is in a hospital, knows what medication is, and understands what an injection is.

29. It is the opinion of Dr. Geller that without medication, Doria Rondeau will deteriorate as she has in the past and that emergency medical intervention ultimately will be required. Without medication, Doria Rondeau cannot care for or even interact with her son, Tony. Furthermore, to allow Doria Rondeau to deteriorate in the State Hospital setting will be detrimental to other patients and to staff who will observe such deterioration.

30. It is Dr. Geller's opinion that the prognosis with treatment with antipsychotic medication is that Doria Rondeau, if she responds favorably to the prescribed prolixin, will cease to believe that medication is poison, will eat adequately, will become capable of making decisions, and will be able to return to the community.

31. In 1980, Doria Rondeau had a radical mastectomy. It is the opinion of Dr. Geller that Doria Rondeau's past use of antipsychotic medication was not the cause of her cancer.

32. The side effects of prolixin include, among other things, stiffness, rigidity, dystonia, rolling of the eyes, restlessness, Parkinsonisms, blurred vision, and skin reactions. One of the long-term, irreversible side effects is tardive dyskinesia. Aside from a patient's response to a particular drug, one of the other factors considered by Dr. Geller in choosing one drug over another is compliance with treatment. Prolixin can be administered at weekly (or longer) intervals, which is a consideration for those patients, such as Doria Rondeau, who are refusing treatment.

33. At Northampton State Hospital, the primary treating psysician is responsible for prescribing specific medications and for monitoring side effects. At the time of hearing, Doria Rondeau's primary physician was Dr. Steliana Naumescu, who is not a psychiatrist.

34. Doria Rondeau is a Roman Catholic. There is nothing in Doria Rondeau's formal, religious background which indicates any belief opposed to medical treatment, including the use of medication.

35. At the time of hearing in this matter, on July 22 and August 3 and 4, 1982, there was no evidence that Doria Rondeau was in any continuing danger of dehydration.

Based upon the above findings of fact, I conclude that Doria Rondeau is mentally ill and incapable of taking care of herself by reason of mental illness. I further conclude that Doria Rondeau is, at the present time, incapable of making an informed decision regarding her medical care, including treatment with antipsychotic medication.

In its pre-trial order of June 24, 1982, this Court indicated that a substantial question exists as to the applicability of the criteria and procedures set forth by the Supreme Judicial Court in its decision in **Roe, supra,** to the proceedings before this Court and involving an involuntarily committed mental patient. As the Supreme Judicial Court stated in **Roe,** ". . . we decline to rule on the right of patients confined against their will to State hospitals to refuse antipsychotic medication." **Id.** at 421 N.E. 2d 62.

Despite the limits of the **Roe** decision, the relevant factors set forth by the Supreme Judicial Court which are to be considered in a substituted judgment determination have been addressed in the proceeding presently before this Court. Thus, for example, from the findings of fact, it is clear that the ward's stated preference is one of opposition to antipsychotic medication. Although such expression of preference is entitled to very serious consideration, it is my conclusion that Doria Rondeau, at the present time, lacks the capacity to make a medical treatment decision regarding antipsychotic medication. As set forth in the findings of fact, Doria Rondeau has stated that the medication is poison, that it will cripple her insides, and that she will die within four days. On past occasions, Doria Rondeau has also stated that antipsychotic medication was the cause of her cancer. She has further indicated that at least one physician told her not to take the medication. Although there is obviously a rational aspect to some of these statements, I have found that Doria Rondeau's present refusal of antipsychotic medication is rooted in her psychotic delusional system. I further conclude, while recognizing the inherently subjective aspect of the substituted judgment determination, that if Doria Rondeau were able to reflect upon and consider her current circumstances, she would choose treatment with antipsychotic medication and likelihood of recovery over her present marginal condition and probable long-term incarceration in the State hospital, a setting for which Doria Rondeau has expressed negative feelings.

Regarding the ward's religious beliefs, as stated in the findings of fact, there is nothing in Doria Rondeau's religious background which indicates any belief opposed to medical treatment, including medication.

The impact upon the ward's family also leads to the conclusion that Doria Rondeau, if competent, would choose treatment. As the findings of fact reveal, in her present condition, Doria Rondeau cannot communicate with nor continue her close relationships with her son, Tony, and her daughter, Paulette Gallese.

In his testimony, Dr. Jeffrey Geller described the adverse side effects of antipsychotic medication, consideration of which is also required in a substituted judgment determination. Furthermore, this Court recognizes the extreme

intrusiveness of the forcible injection of antipsychotic medication. See **Roe, supra,** at 421 N.E. 2d 52, 53. In its interlocutory order of August 4, 1982, authorizing treatment, this Court required that the Department of Mental Health report to this Court at least every two weeks as to its treatment plan for Doria Rondeau, including the type of medication to be utilized, dosage and frequency, specific steps to monitor the side effects of such medication, and alternatives, if any, to the administration of antipsychotic medication. The physician authorized by this Court to provide such treatment with antipsychotic medication is Dr. Jeffrey Geller, a psychiatrist. In addition, from the testimony presented, there is no evidence that the potential side effects cannot be monitored and controlled. Finally, there is no evidence of long-term, irreversible side effects such as tardive dyskinesia.

The consequences for Doria Rondeau if treatment is refused have been described in detail in the findings of fact. See paragraphs 21 and 29 above. At best, she can be maintained indefinitely in a State hospital setting in her present marginal condition. At worst, she will deteriorate as she has in the past and require emergency medical intervention.

The prognosis with treatment has also been described in this Court's findings of fact. Both physicians concur that with the administration of antipsychotic medication, there is great likelihood of improvement.

For all of these reasons, therefore, I conclude that Doria Rondeau, if competent and capable of making a medical treatment decision, would accept the medication.

As set forth above, the Supreme Judicial Court in **Roe, supra,** did not rule on the right of patients confined against their will to State hospitals to refuse antipsychotic medication. In the proceeding presently before this Court, therefore, there are a number of important and unanswered questions.

Firstly, for patients such as Doria Rondeau, who are involuntarily committed to State hospitals, is there a constitutional or common law right to refuse antipsychotic medication?

Secondly, if such right exists, for those individuals who are not competent or capable of exercising such right, is a guardianship appointment necessary in order to authorize the forcible administration of antipsychotic medication?

And thirdly, if a guardianship appointment is required, is the criteria set forth by the Supreme Judicial Court in **Roe, supra,** including the necessity of a substituted judgment determination and consideration of the relevant factors enumerated therein, applicable to cases such as this involving individuals who are involuntarily committed?

Obviously, one of the major factors which distinguishes this case from **Roe** is that the proposed ward in this guardianship proceeding is not living in the community but rather has been involuntarily committed to a State hospital by the District Court pursuant to G.L. c. 123, secs. 7, 8. As the findings of fact indicate, without treatment, Doria Rondeau will remain incarcerated for an indefinite period of time in a State hospital. On the other hand, with treatment, there is great likelihood that Doria Rondeau will improve to the point where she can be discharged from the State hospital to the community.

A fourth question, therefore, is the following: if the **Roe** criteria is applicable to the proceeding presently before this Court, how is the factor of involuntary commitment to be considered, if at all, by this Court in making its substituted judgment determination?

Furthermore, at the time of hearing, both counsel for the ward and the guardian ad litem opposed the Department of Mental Health's motion for the appointment of a temporary guardian of Doria Rondeau for reason that, at the present time, no medical emergency exists (counsel for the ward also objected to the appointment on other

grounds). Doria Rondeau's physical condition is not in jeopardy, as it was at the time of her admission to Northampton State Hospital, when she was suffering from dehydration. In support of their position, counsel for the ward and the guardian ad litem cite that part of G.L. c. 201, sec. 14, which reads:

> Whenever a temporary guardian is so appointed, the decree or order shall indicate **the nature of the emergency requiring such appointment** and the particular harm sought to be avoided, and shall state that the temporary guardian so appointed is only authorized to take such actions with regard to the ward as are reasonably necessary to avoid the occurrence of that harm (emphasis added).

Counsel for the Department of Mental Health, on the other hand, argues that a temporary guardian may be appointed upon a finding by this Court that the welfare of the proposed ward requires the "immediate" appointment of a temporary guardian and that an "emergency" (which is not defined in the statute) is not required.

A further aspect of this particular question is that the Department of Mental Health has not marked for hearing its petition for permanent guardianship, even though the return date on the citation, July 7, 1982, has passed. As stated at the beginning of the decision, the Department's petition requests the appointment of "some suitable person" as permanent guardian. This Court recognizes that the Commonwealth does not have a pool of individuals ready, willing, and able to act as guardians, either temporary or permanent, in all cases where needed. In effect, as in this case, the Department of Mental Health must frequently request one temporary guardianship appointment after another depending upon the medical needs of its client population. Two additional questions, therefore, are raised.

Firstly, does G.L. c. 201, sec. 14 require that an emergency exist as a part of or in addition to the requirement that the welfare of the proposed ward requires the immediate appointment of a temporary guardian? See **Fazio v. Fazio,** 375 Mass. 394, 404, 378 N.E. 2d 751 (1978).

And secondly, if there are no individuals ready, willing, or able to serve as guardians, either temporary or permanent, may the Probate and Family Court, if indicated and after a substituted judgment determination (if required), authorize medical treatment without the necessity of appointing a guardian?

This guardianship proceeding raises important issues regarding the rights of mentally ill persons, as well as the interests of the State in providing care and treatment to individuals who are involuntarily committed. It also raises important questions as to the standards and procedures to be applied by the Probate and Family Court when authorization is sought by the Commonwealth to administer medical care and treatment.

Therefore, pursuant to G.L. c. 215, sec. 13, and Mass. R. Civ. P. 64, this Court shall report the above questions to the Appeals Court (see attached reservation and report of case). For the purposes of Mass. R. App. P. 5, the ward shall be designated as the aggrieved party and treated as the appellant. This Court's interlocutory order of August 4, 1982, authorizing treatment, including the forcible administration of antipsychotic medication, if necessary, shall remain in effect pending consideration and determination of this matter by the Appeals Court.

**The Honorable Sean M. Dunphy**
**Judge of Probate and Family Court**

## RESERVATION AND REPORT TO APPEALS COURT

After hearing and upon this Court's Findings of Fact and issuance of Interlocutory Order in the above-captioned matter, the following questions are hereby reported to the Appeals Court pursuant to G.L. c. 215, sec. 13, and

Mass. R. Civ. P. 64:

1. For patients who are involuntarily committed to State hospitals, is there a constitutional or common law right to refuse antipsychotic medication?

2. If such right exists, for those individuals who are not competent or capable of exercising such right, is a guardianship appointment necessary in order to authorize the forcible administration of antipsychotic medication?

3. If a guardianship appointment is required, is the criteria set forth by the Supreme Judicial Court in its decision **In the Matter of Guardianship of Richard Roe, III**, Mass. Adv. Sh. (1981) 981, 421 N.E. 2d 40 (1981), including the necessity of a substituted judgment determination and consideration of the relevant factors enumerated therein, applicable to cases involving individuals who are involuntarily committed?

4. If the **Roe** criteria is applicable to such cases, how is the factor of involuntary commitment to be considered, if at all, by the Probate and Family Court in making its substituted judgment determination?

5. Does G.L. c. 201, sec. 14 require that an emergency exist as a part of or in addition to the requirement that the welfare of the proposed ward requires the immediate appointment of a temporary guardian?

6. If there are no individuals ready, willing, or able to serve as guardians, either temporary or permanent, may the Probate and Family Court, if indicated and after a substituted judgment determination (if required), authorize medical treatment without the necessity of appointing a guardian?

**The Honorable Sean M. Dunphy**
**Judge of Probate and Family Court**